[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-12973

_____

D.C. Docket No. 1:12-cr-20763-CMA-3

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

EARNEST BALDWIN,
EARL BALDWIN,

Defendants - Appellants.

_____

No. 13-12999

_____

D.C. Docket No. 1:12-cr-20763-CMA-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

LINETEN BELIZAIRE,

Defendant - Appellant.

---

Appeals from the United States District Court
for the Southern District of Florida

---

(December 17, 2014)

Before ED CARNES, Chief Judge, and RESTANI,[*] Judge, and ROBRENO,[**] District Judge.

RESTANI, Judge:

Appellants were charged with various crimes arising out of a scheme involving the unauthorized use of personal identifying information to claim fraudulent tax refunds, which were deposited onto debit cards opened in the names of identity theft victims. Appellants Earnest Baldwin ("Earnest") and Earl Baldwin ("Earl") were convicted by a jury. Earnest and Earl appeal their convictions and sentences. Appellant Lineten Belizaire ("Belizaire") pleaded guilty, but appeals his sentence. After careful consideration and with the benefit of oral argument, we affirm the district court in all respects.

---

[*] Honorable Jane A. Restani, United States Court of International Trade Judge, sitting by designation.

[**] Honorable Eduardo C. Robreno, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

**BACKGROUND**

In January 2012, Earnest was pulled over for making an improper left turn, and during the course of the stop, police saw evidence of possible identity theft and/or tax fraud in plain view. A search of the vehicle revealed mail addressed to people unrelated to Earnest or the vehicle's passenger, thirty-nine debit cards, a laptop, approximately $4,000 in cash, and documents and notebooks containing individuals' names, dates of birth, Social Security numbers, and addresses. The papers and notebooks contained: (1) over 1,000 individuals' names, Social Security numbers, and dates of birth; (2) IRS telephone numbers; (3) personal identification numbers for online tax returns; (4) requested refund amounts, totaling over $1 million; (5) debit card account numbers; (6) employer identification numbers; and (7) email addresses for online tax returns. From this evidence, investigators discovered that hundreds of fraudulent tax returns had been filed. Approximately $1.8 million in fraudulent refunds had been requested, and the IRS paid out approximately $840,000. Many of these refunds were loaded onto debit cards.

In addition to the evidence found in the vehicle he was driving, Earnest also was linked to residences where the returns were filed and was photographed by surveillance cameras using the unauthorized debit cards. Earl was implicated in the conspiracy because tax returns were filed from internet protocol ("IP")

3

addresses registered in his name, and he also was recorded by surveillance cameras using unauthorized debit cards.  Earnest and Earl were convicted of conspiracy to commit fraud against the government with respect to claims in violation of 18 U.S.C. § 286, conspiracy to use unauthorized access devices in violation of 18 U.S.C. § 1029(b)(2), use of unauthorized access devices in violation of 18 U.S.C. § 1029(a)(2), and aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1). Earnest also was convicted of possessing fifteen or more unauthorized access devices in violation of 18 U.S.C. § 1029(a)(3).  Earl was sentenced to a total of 84 months' imprisonment.  Earnest was sentenced to a total of 172 months' imprisonment.

Belizaire was implicated in recruiting people to provide addresses to receive debit cards that would be loaded with fraudulent tax refunds, exchanging personal identification information of victims, filing the fraudulent returns, and using debit cards loaded with fraudulent refunds.  Belizaire pleaded guilty to conspiracy to defraud the government with respect to claims in violation of 18 U.S.C. § 286 and aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1).  He was sentenced to 105 months' imprisonment as to the conspiracy count and was given a consecutive sentence of 24 months' imprisonment on the aggravated identity theft count, for a total of 129 months' imprisonment.

4

## DISCUSSION

Earnest appeals the district court's denial of his motion to suppress certain incriminating evidence, the district court's denial of his motion for mistrial, the district court's denial of his motion for acquittal on the two conspiracy counts and the aggravated identity theft counts, and various aspects of his sentence. Earl challenges the district court's denial of his motion for acquittal on the two conspiracy counts and the aggravated identity theft counts, the district court's instructions to the jury on the aggravated identity theft counts, and various aspects of his sentence. Belizaire also challenges various aspects of his sentence. We first discuss the issues pertaining to the determination of guilt or innocence for Earl and Earnest. We then discuss the sentencing issues as they pertain to each defendant.

### I. Issues Bearing on Determination of Guilt

#### A. Earnest Baldwin

##### 1. Denial of Motion to Suppress

Earnest argues that the district court erred in admitting evidence discovered during the search of the vehicle he was driving, which occurred after he had been arrested for presenting his brother's driver's license as his own to a police officer. In reviewing a denial of a motion to suppress, we review the district court's factual findings for clear error and the application of the law to those facts de novo. United States v. Yeary, 740 F.3d 569, 579 n.25 (11th Cir. 2014).

5

Earnest's argument is meritless.  "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more."  Pennsylvania v. Labron, 518 U.S. 938, 940 (1996).  The district court found, and Earnest does not challenge, that there was mail from the IRS not addressed to Earnest or the other passenger in the vehicle, debit cards not in their names, and currency within plain view.  This was sufficient to establish probable cause to search the vehicle for evidence relating to identity theft and tax fraud.  To the extent that Earnest argues that the police were required to obtain a warrant before allegedly opening a duffel bag found in the vehicle, his arguments are unavailing.  Once probable cause exists to search the vehicle, the police may search all parts of the vehicle, and any containers therein, where the object of the search might be found.  Wyoming v. Houghton, 526 U.S. 295, 301 (1999).  Earnest's reliance on the Supreme Court's pronouncements in Arizona v. Gant regarding searches of automobiles incident to arrest is misplaced, as probable cause existed to support the search of the vehicle independent of his arrest.  See 556 U.S. 332, 347 (2009) (noting that warrantless searches for evidence relevant to crimes other than the offense of arrest would be authorized if probable cause existed to search for evidence of those crimes).

## 2. Denial of Motion for Mistrial

Earnest argues that the district court should have granted a mistrial when Earl's counsel suggested that Earnest had taken advantage of Earl and referred to the biblical story of Cain and Abel. We review the refusal to grant a mistrial for abuse of discretion. Frederick v. Kirby Tankships, Inc., 205 F.3d 1277, 1285 (11th Cir. 2000). We find no such abuse.

Earnest argues that a mistrial was "manifestly necessary," because the mutually antagonistic defenses of Earl and Earnest made it impossible for Earnest to receive a fair trial. But "co-defendants do not suffer prejudice simply because one co-defendant's defense directly inculpates another, or it is logically impossible for a jury to believe both co-defendants' defenses." United States v. Blankenship, 382 F.3d 1110, 1125 (11th Cir. 2004). Furthermore, the specific comments complained of by Earnest were isolated and served mainly as commentary on the government's characterization of Earnest, rather than as an attempt by Earl to independently inculpate Earnest. We find no abuse of discretion in the district court's refusal to grant Earnest a mistrial based on these statements. See id. at 1122, 1125–26 (holding that there was neither prejudice nor a need for a mistrial despite repeated remarks by counsel for co-defendant directly targeting appellants).

7

### 3.  Sufficiency of Evidence Regarding Fraudulent Claims Conspiracy

Earnest argues that the evidence was insufficient to convict him of conspiracy to submit fraudulent claims to the government.  Earnest argues that there was no evidence that he personally filed any fraudulent tax returns; rather, the only evidence linking him to the conspiracy was his receipt of the conspiracy's proceeds.  We review challenges to the sufficiency of the evidence to support a conviction de novo, viewing the evidence and all reasonable inferences derived therefrom in the light most favorable to the government.  United States v. To, 144 F.3d 737, 743 (11th Cir. 1998).

> 18 U.S.C. § 286 provides that:
>
> Whoever enters into any agreement, combination, or conspiracy to defraud the United States, or any department or agency thereof, by obtaining or aiding to obtain the payment or allowance of any false, fictitious or fraudulent claim, shall be fined under this title or imprisoned not more than ten years, or both.

To prove the conspiracy element, the government was required to show "the existence of an agreement to achieve an unlawful objective, the defendant's knowing and voluntary participation in the conspiracy, and the commission of an overt act in furtherance of it."  United States v. Gupta, 463 F.3d 1182, 1194 (11th Cir. 2006).  "[T]he extent of participation in the conspiracy or extent of knowledge of details in the conspiracy does not matter if the proof shows the defendant knew the essential objective of the conspiracy."  Id. (internal quotation marks omitted).

8

There was overwhelming evidence of a scheme to defraud involving coordinated activity among the individuals charged.  Although there was no testimony that Earnest personally filed a fraudulent return, other evidence presented at trial clearly was sufficient to link Earnest to the scheme and to convict Earnest of this charge.  As already described, Earnest was pulled over while driving a vehicle full of evidence linked to the conspiracy.  Earnest's fingerprints were found on the computer screen and on one of the documents, and his personal documents were mixed in with this evidence.  When Earnest was pulled over, he attempted to hide some of the mail.  Earnest's address and the employer identification number for Earnest's previous employer repeatedly appeared on the fraudulent returns, and fraudulent returns were filed from an IP address registered to a residence associated with Earnest.  Earnest also was photographed making withdrawals of the refunds using reordered cards with the same account numbers as the cards seized during the traffic stop.  A reasonable jury could conclude from this evidence that Earnest knowingly and willfully agreed with others to submit false tax returns.

### 4.  Sufficiency of Evidence Regarding Access Device Fraud Conspiracy

Earnest also argues that the evidence was insufficient to convict him of joining the access device conspiracy.  18 U.S.C. § 1029(a)(2) provides that whoever "knowingly and with intent to defraud traffics in or uses one or more

unauthorized access devices during any one-year period, and by such conduct obtains anything of value aggregating $1,000 or more during that period" shall be subjected to criminal penalties. Debit cards are "access devices." See 18 U.S.C. § 1029(e)(1) (defining "access device" to include "any card . . . that can be used . . . to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds"); United States v. Charles, 757 F.3d 1222, 1224 (11th Cir. 2014). 18 U.S.C. § 1029(b)(2) provides criminal liability for "[w]hoever is a party to a conspiracy of two or more persons to commit an offense under subsection (a) of this section, if any of the parties engages in any conduct in furtherance of such offense." The same evidence supporting the fraudulent claims conspiracy conviction amply supports the jury's finding that Earnest agreed with others to use unauthorized access devices.

**5. Sufficiency of Evidence Regarding Possession of Fifteen or More Unauthorized Access Devices**

Earnest contends that the evidence was insufficient for the jury to find that he possessed fifteen or more access devices because the debit cards were not found on his person and there was no proof that he knew they were inside the vehicle and had an intention to take possession and control of them. 18 U.S.C. § 1029(a)(3) makes it a crime for anyone to "knowingly and with intent to defraud possess[] fifteen or more devices which are counterfeit or unauthorized access devices." A person constructively possesses an item when he "has knowledge of the thing

10

possessed coupled with the ability to maintain control over it or reduce it to his physical possession, even though he does not have actual personal dominion." Aqua Log, Inc. v. Georgia, 594 F.3d 1330, 1336 (11th Cir. 2010) (internal quotation marks omitted).  Constructive possession also occurs when a person exercises "ownership, dominion, or control over the contraband itself or dominion or control over the premises or the vehicle in which the contraband [is] concealed." Id. at 1336–37.

The evidence in total showed that Earnest was aware of and had the ability to control the incriminating evidence in the vehicle, including the debit cards. Earnest was the driver of the vehicle, he attempted to hide pieces of mail, his fingerprints were on the computer and one of the documents found in the vehicle, and Earnest's personal documents were mixed in with the loose documents pertaining to stolen personal identity information.  Furthermore, Earnest subsequently was photographed using reordered cards containing the same account numbers as the ones seized from the vehicle.  This evidence was sufficient for the jury to conclude that Earnest constructively possessed the unauthorized debit cards found in the vehicle.

**6. Sufficiency of the Evidence Regarding Aggravated Identity Theft**

Finally, Earnest argues that the evidence was insufficient to convict him of aggravated identity theft because there was no evidence that he knew that the

11

means of identification he used belonged to real people.  18 U.S.C. § 1028A(a)(1) provides for an additional two-year sentence for whoever "during and in relation to" certain felonies, including 18 U.S.C. § 1029(b)(2), "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person."  The prosecution is required to prove "that the defendant knew that the means of identification at issue belonged to another person."  Flores-Figueroa v. United States, 556 U.S. 646, 657 (2009).  To convict Earnest of aggravated identity theft, the government was required to show that Earnest knew that "J.T." and "A.W.," the individuals whose names were on the cards used by Earnest, were real people.

Personal identifying information related to J.T. was found in the vehicle driven by Earnest on a document from the Florida Agency for Persons with Disabilities, which supports the inference that Earnest knew that J.T. was a real person.  The jury also could consider that J.T.'s information was used as part of a scheme to obtain a refund from the IRS, which verifies the name and Social Security number of the person requesting the refund, in considering whether Earnest knew that J.T. was a real person.  See United States v. Gomez-Castro, 605 F.3d 1245, 1249–50 (11th Cir. 2010) (sufficient circumstantial evidence of knowledge that identity belonged to real person when defendant had "repeatedly and successfully tested" the underlying personal information by obtaining a

12

driver's license and benefit cards, credit and debit cards, and a passport).  This was sufficient evidence for the jury to find beyond a reasonable doubt that Earnest knew that J.T. was a real person.

Regarding A.W., the evidence showed that A.W.'s personal information was found in a notebook in the vehicle Earnest was driving, as was a card issued in A.W.'s name.  After that card had been seized, Earnest was photographed using a reordered card in the name of A.W.  Based on Earnest's possession of A.W.'s personal information and the repeated testing of A.W.'s identity, the jury reasonably could find that Earnest knew that A.W. was a real person.  See id.

## B. Earl Baldwin

### 1.  Jury Instructions Regarding Aggravated Identity Theft Count

Earl contends that the district court erred in allowing the jury to disregard discrepancies between the debit card numbers listed in Counts 11 and 16 of the indictment and those that were presented at trial.  Count 11 charged Earl with using a debit card account number with the last four digits of "9000," but the evidence offered at trial listed the account as ending in "9005."  Similarly, Count 16 charged Earl with using a card ending in "9440," but the evidence offered at trial listed the account as ending in "9449."  In response to a jury question about this discrepancy, the district court, over Earl's objection, instructed the jury as follows:

> In response to your questions pertaining to Counts 11 and 16, you are correct that the last digits of the account numbers listed are incorrect.

13

> You are instructed that the Court has found the last digits on the account numbers shown in those Counts constitute scrivener's errors that do not affect the validity of the Superseding Indictment.

Earl argues that these instructions constructively amended the indictment, requiring reversal.

A constructive amendment of an indictment "occurs when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment." United States v. Keller, 916 F.2d 628, 634 (11th Cir. 1990). This is in contrast to a variance, where the evidence at trial differs from what is alleged in the indictment. Id. A constructive amendment constitutes per se reversible error if the objection has been preserved, while a defendant must show substantial prejudice to obtain reversal because of a variance. See id. at 633. Earl's argument rests solely on his contention that the instructions constituted a constructive amendment of the indictment. Nowhere in his brief does he argue that he suffered substantial prejudice.

We agree with the district court that the discrepancies were scrivener's errors that the jury could disregard. See Russell v. United States, 369 U.S. 749, 770 (1962) ("[A]n indictment may not be amended except by resubmission to the grand jury, unless the change is merely a matter of form." (emphasis added)); cf. Stirone v. United States, 361 U.S. 212, 217 (1960) (holding that defendant was

14

deprived of Fifth Amendment right to be tried only on charges presented in indictment when nature of alleged scheme was significantly altered and "the addition [was] neither trivial, useless, nor innocuous" (emphasis added)).  The indictment alleged that on May 22, 2012, Earl used an account number ending in "9000" issued to "R.E.," and that on June 27, 2012, Earl used an account number ending in "9440" issued to "S.T."  Evidence presented at trial showed that Earl used a card issued in the name of Ronald Ephord on May 22 and that Earl used a card issued in the name of Shatarra Torrey on June 27.  The only discrepancy was in the very last digit of the card numbers.  Notably, neither party discerned any discrepancy regarding the account numbers until it was raised by the jury during deliberations.  Cf. United States v. Miller, 471 U.S. 130, 135 (1985) (explaining that notice concerns "are among the important concerns underlying the requirement that criminal charges be set out in an indictment").

To the extent that the district court's instructions could be considered anything more than a minor clerical correction, the correction is better understood as a variance rather than a constructive amendment of the indictment.  Earl relies heavily on our decisions in Keller, 916 F.2d 628, and United States v. Narog, 372 F.3d 1243 (11th Cir. 2004), in support of his constructive amendment argument.  In Keller, the grand jury charged a conspiracy between two specific individuals, which the government attempted to prove at trial, but the district court allowed the

15

jury to convict as long as it found that the defendant agreed to commit the crime with anyone. 916 F.2d at 636. In Narog, the grand jury charged a conspiracy to possess pseudoephedrine "knowing . . . that the listed chemical would be used to manufacture a controlled substance, that is, methamphetamine." 372 F.3d at 1246. Although the prosecution tried the case as a methamphetamine case, the district court instructed the jury that it could convict as long as it found that the defendants knew that the pseudoephedrine would be used to manufacture any controlled substance. Id. at 1247. In both cases, we found an impermissible alteration of the essential elements of the offenses charged that broadened the possible bases of conviction. Keller, 916 F.2d at 636; Narog, 372 F.3d at 1249–50.

A potentially analogous situation to Keller and Narog in this case would be if the district court had allowed the jury to convict Earl of aggravated identity theft as long as it found that Earl had used any means of identification belonging to any person. But that is not what happened. The indictment charged Earl with using debit cards in the names of "R.E." and "S.T.," and those charges were proven at trial. The district court did not allow a shift in theory regarding the essential elements of the crime, such as allowing a conviction based on the use of a different means of identification (e.g., Social Security number or driver's license) or the use of a different individual's identity (i.e., individuals other than R.E. and S.T.). The difference in proof offered at trial is better considered a variance from the facts

16

alleged in the indictment.  Because Earl does not allege any prejudice arising from this variance, reversal is not warranted.  See Keller, 916 F.2d at 633.

### 2.  Sufficiency of Evidence Regarding Fraudulent Claims Conspiracy

Earl argues that the government failed to prove that he entered into any agreement to present false claims to the government.  Earl notes that he was absent from the vehicle containing the incriminating evidence, no documents in the vehicle referenced Earl, and none of the evidence seized contained Earl's fingerprints.  Earl also notes that there was no evidence that he personally filed the tax returns, Earnest and Belizaire also had access to the IP addresses used to file the fraudulent returns, and Earl was observed using only two fraudulently obtained cards on a handful of transactions.  Earl further notes that neither Belizaire nor Marckell Steward, another conspirator, named Earl as a co-conspirator in their factual proffers when pleading guilty.  Although the evidence against Earl may not be as overwhelming as the evidence against Earnest, we conclude it is sufficient to sustain Earl's conviction.

First, IP records showed that at least fifty-eight fraudulent returns requesting approximately $200,000 were submitted from the address listed on Earl's driver's license.  Second, several of the fraudulent returns listed this address, and a handful of returns were sent to that address.  Third, IP records showed that when Earl moved to another address, fraudulent returns were submitted from that new

17

address.  Although the fact that Belizaire and Earnest lived with Earl at some point at both locations somewhat decreases the probative value of the IP addresses, the jury could infer that Earl was at least aware of the general contours of the scheme based on the amount of activity taking place within the residences, the amount of information needed to file so many returns, as reflected by the large amount of evidence found in the vehicle, the rather small size of the residences (between 1,000 and 1,100 square feet), the continuation of the fraud at the second residence, and the fact that the scheme was being perpetrated by family members at the joint residences.  See United States v. Brantley, 68 F.3d 1283, 1288 (11th Cir. 1995) (noting that personal relationship and close proximity between defendant and conspirators during commission of the offense made it more likely that the defendant was aware of the illicit plan).

Next, Earl's involvement with the scheme could be inferred from the facts surrounding his use of the proceeds of the fraudulent claims conspiracy.  Earl was captured on video making an ATM withdrawal from a card issued in Ronald Ephord's name that had been loaded with fraudulent returns.  A $20 payment with that card was made to Earl's auto insurance company as well.  Nearly $1,500 was loaded onto this card, and nearly all of the $1,500 was withdrawn.  Ephord's social security number was in the notebook seized from the vehicle driven by Earnest.  Earl also was captured on video making two ATM withdrawals from a card issued

18

in the name of Shatarra Torrey. Torrey's refund had been submitted from Earl's IP address. Finally, Ephord's and Torrey's returns listed their address as 1970 NW 47th Street, and debit card accounts in their names also listed this as their address. A debit card issued in the name of Earl listed that address as well, and there is no other evidence in the record tying this address to other conspirators.

A reasonable juror could infer based on the entirety of the evidence presented that Earl agreed to and intentionally participated in the fraudulent claims conspiracy.

### 3. Sufficiency of Evidence Regarding Access Device Fraud Conspiracy

Earl similarly contends that the evidence was insufficient to find that he agreed to use unauthorized access devices. Earl contends that the evidence in support of this claim at most establishes the substantive crime of unauthorized use of an access device. We conclude that the evidence was sufficient to support the jury's verdict on this count.

Evidence was presented regarding Earl's use of two unauthorized access devices on at least four occasions, withdrawing approximately $1,070. Based on the evidence presented at trial, the jury reasonably could infer that Earl obtained the cards from, or with the assistance of, one of the members of the conspiracy. Even if Earl did not apply personally for the debit cards or file the fraudulent tax returns that were loaded onto the devices, the jury reasonably could infer that Earl

19

knew of the illicit nature of the devices, as the cards were not in his name and had been obtained in connection with the tax refund scheme involving Earl's family members that had been operating out of his house.  See Brantley, 68 F.3d at 1288.  This was sufficient evidence for the jury to find that Earl knowingly agreed with other individuals to commit a violation of 18 U.S.C. § 1029(a)(2).

### 4.  Sufficiency of Evidence Regarding Aggravated Identity Theft

Finally, Earl argues that the evidence was insufficient for the jury to find that he knew that the access devices were in the names of real people.  As explained above, because of the personal and physical proximity to the fraudulent claims and access device conspiracies, the jury could conclude that Earl was aware of the nature of these conspiracies.  See Brantley, 68 F.3d at 1288.  The connection between the address listed for the card issued in Earl's name and the address listed in the tax returns and debit card applications of Ephord and Torrey also supported this inference.  Based on Earl's awareness that the cards were loaded with funds from a fraudulent tax refund scheme, the jury reasonably could conclude that Earl knew that the cards were issued in the names of real people, because the federal government is unlikely to issue tax returns unless it has verified that the person requesting it is a real person.  See Gomez-Castro, 605 F.3d at 1249–50.

20

## II. Sentencing Issues

### A. Earnest Baldwin

#### 1. Sentencing Enhancements

In challenging his sentence, Earnest first asserts that the district court erred in applying several sentencing enhancements. Specifically, Earnest challenges his sixteen-level enhancement for an intended loss of greater than $1 million, <u>see</u> U.S.S.G. § 2B1.1(b)(1)(I), his six-level enhancement for 250 or more victims, <u>see</u> U.S.S.G. § 2B1.1(b)(2)(C), and his two-level enhancement for the production or trafficking of an unauthorized access device, <u>see</u> U.S.S.G. § 2B1.1(b)(11)(B)(i).

##### i. Intended Loss

A district court's determination of loss is reviewed for clear error. <u>United States v. Barrington</u>, 648 F.3d 1178, 1197 (11th Cir. 2011). The Sentencing Guidelines "do not require a precise determination of loss," and a district court "need only make a reasonable estimate of the loss, given the available information." <u>Id.</u> Under the Sentencing Guidelines, "loss is the greater of actual loss or intended loss," U.S.S.G. § 2B1.1, cmt. n.3(A)(i), and intended loss is the pecuniary harm that was intended to result from the offense, including pecuniary harm "that would have been impossible or unlikely to occur." <u>Id.</u>, cmt. n.3(A)(ii). The district court may make factual findings regarding loss based on trial evidence, undisputed statements in the Presentence Investigation Report ("PSI"), or evidence

21

presented at the sentencing hearing.  United States v. Bradley, 644 F.3d 1213, 1290 (11th Cir. 2011).  This evidence may include "specific circumstantial evidence," id., but the district court "may not speculate about the existence of a fact that would result in a higher sentence."  Barrington, 648 F.3d at 1197.

A defendant may be held responsible for the reasonably foreseeable acts of his co-conspirators in furtherance of the conspiracy.  See United States v. Mateos, 623 F.3d 1350, 1370–71 (11th Cir. 2010).  A district court must determine the scope of the defendant's criminal activity prior to considering all reasonably foreseeable acts of co-conspirators.  Id. at 1370.  In determining the scope of "the criminal activity the particular defendant agreed to jointly undertake," the district "court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others."  United States v. Petrie, 302 F.3d 1280, 1290 (11th Cir. 2002) (internal quotation marks omitted).  If the record otherwise supports the court's determination, a failure to make specific findings will not require vacating the sentence.  See id. at 1290.

The district court did not clearly err in calculating the loss attributed to Earnest to be $1,803,826.  According to the PSI, the $1,803,826 represented the intended loss of the conspiracy, as it was the total amount of fraudulent refunds requested from the IRS, and Earnest does not dispute this figure.  See Bradley, 644 F.3d at 1290.  The evidence supporting the district court's attribution of the entire

loss to Earnest was substantial.  Earnest was found with much of the stolen identification information and his personal documents were mixed in with the documents containing the stolen identification information.  Earnest lived at the address where many of the fraudulent returns had been filed, he had worked at the company that was listed as the employer in many of the fraudulent returns, and his fingerprints were on the laptop and documents seized.  Finally, the government presented still photographs showing Earnest making withdrawals of distributed tax refunds from debit card accounts connected to the conspiracy, including reordered debit cards with the same account numbers as the ones seized from the vehicle after Earnest's traffic stop.  This evidence sufficiently established Earnest as a key member who agreed to participate fully in the conspiracy.  Accordingly, the district court did not err in holding Earnest accountable for the total amount of the tax returns fraudulently filed in connection with the conspiracy.

### ii.  Victim and Access Device Enhancements

Earnest also challenges the district court's enhancements of his sentence for the number of victims and for the production or trafficking of access devices. Earnest argues that other co-conspirators filed the fraudulent returns using the stolen identity information so that the debit cards could be loaded with refunds. Similar to his challenge to the determination of the amount of loss attributable to him, these challenges amount to a claim that he was not sufficiently involved in the

23

conspiracy to be held responsible for his co-conspirators' actions.  These challenges fail for the same reasons we have just discussed.  See Mateos, 623 F.3d at 1370–71; Petrie, 302 F.3d at 1290.

## 2.  Restitution

Earnest next challenges the restitution amount of $500,000, arguing that the government failed to produce evidence as to the amount of the IRS's actual losses, as the government did not determine the amount of distributed refunds that were still recoverable from the debit card accounts.  We review the legality of a restitution order de novo and the underlying factual findings for clear error.  United States v. Brown, 665 F.3d 1239, 1252 (11th Cir. 2011).  The amount of restitution "must be based on the amount of loss actually caused by the defendant's conduct." United States v. Liss, 265 F.3d 1220, 1231 (11th Cir. 2001).  The government bears the burden of establishing the amount of restitution by a preponderance of the evidence.  United States v. Futrell, 209 F.3d 1286, 1290 (11th Cir. 2000); see also 18 U.S.C. § 3664(e) ("Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence."). Because "the determination of the restitution amount is by nature an inexact science," United States v. Huff, 609 F.3d 1240, 1248 (11th Cir. 2010) (internal quotation marks omitted), where difficulties arise, a district court may accept a

"reasonable estimate" of the loss based on the evidence presented.  Futrell, 209 F.3d at 1291–92.

The district court's estimation of the restitution amount owed by Earnest was not clearly erroneous.  Although the government was unable to establish an exact restitution amount, its calculation was not based on speculation, but rather, on reasonable estimates taken from facts in the record.  See id. at 1292.  The restitution amount was based on the difference between the total amount of refunds distributed during the course of the conspiracy and the total amount recoverable from the distributed refunds.  The government presented evidence that the total amount of refunds distributed during the conspiracy was $838,000.  With respect to the total amount recoverable from the distributed refunds, the government argued that calculating the amount would necessarily require an estimate given the sheer number of debit card companies involved.  The government asserted that approximately one-third of the distributed tax refunds were recoverable.  The one-third estimate was based on a representative sample of the debit card accounts as well as the testimony of Charles Torres, a special agent at the IRS.  It was not clear error to rely on the one-third estimate because there was evidence that it was a fair estimate, and the government reduced the total amount paid out by more than one-third, from $838,000 to $500,000.

25

Furthermore, there was no error in holding Earnest jointly and severally liable for the entire restitution amount. When more than one defendant contributes to the loss of a victim, the district court "may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h). Based on Earnest's level of involvement in the scheme, the district court was warranted in holding him responsible for the entire restitution amount. The restitution order is thus affirmed.

### 3. Reasonableness of Sentence

Earnest's final challenge to his sentence is that it was substantively unreasonable because there was a "significant sentencing disparity" between his 172-month sentence and the 72-month sentence of his co-conspirator, Marckell Steward. The reasonableness of a sentence is reviewed for abuse of discretion. Gall v. United States, 552 U.S. 38, 41 (2007). Although Steward's sentence was less than one-half of Earnest's, there were no unwarranted sentencing disparities between them because Steward and Earnest were not similarly situated. Steward cooperated with the government and entered into a plea agreement, but Earnest provided no assistance and proceeded to trial. Additionally, Steward had a criminal history category of I, whereas Earnest had a criminal history category of III. Accordingly, they were not similarly situated, and it would have been

26

improper for the district court to have compared them.  See United States v. Jayyousi, 657 F.3d 1085, 1117–18 (11th Cir. 2011) (holding that it is erroneous for a district court to compare the sentences of a defendant who pleaded guilty with one who did not and to compare defendants with significantly different criminal histories).

Further, the record establishes that the district court correctly calculated and carefully reviewed Earnest's guideline range.  See Gall, 552 U.S. at 54 ("[A correct Guidelines range] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities.").  Thus, the district court gave significant weight and consideration to the need to avoid unwarranted disparities when it imposed Earnest's sentence.  See id.  The district court also properly considered the other relevant factors in 18 U.S.C. § 3553(a).  Accordingly, under the totality of the circumstances, Earnest has not shown that his sentence was substantively unreasonable.  See United States v. Gonzalez, 550 F.3d 1319, 1324 (11th Cir. 2008) (explaining that the district court need not discuss each factor explicitly and that "[w]e will defer to the district court's judgment regarding the weight given to the § 3553(a) factors unless the district court has made a clear error of judgment" (internal quotation marks omitted)).

## B. Earl Baldwin

Earl raises several arguments regarding his sentence.  These challenges can be reduced to three general arguments.  First, Earl contends that the district court erred in attributing the acts of his co-conspirators to him for sentencing purposes without making adequate findings regarding Earl's individual role in the conspiracy.  Earl additionally asserts that his sentence was procedurally and substantively unreasonable.  Finally, Earl challenges the district court's restitution order, arguing that the district court erred in holding Earl jointly and severally liable for the full amount of loss suffered by the IRS.

### 1.  Relevant Conduct for Sentencing

Earl argues that the district court improperly attributed the entire $1,803,826 in tax refunds filed during the fraudulent claims conspiracy to him when the evidence against him was limited to his use of two cards to withdraw approximately $1,070.  Similarly, Earl contends that the district court improperly calculated the number of victims by imputing the actions of every co-conspirator to him when Earl was photographed using the cards of only two individuals.  Earl also argues that the district court erred in applying a two-level enhancement for the production or trafficking of unauthorized access devices even though there was no

evidence that Earl personally produced or trafficked access devices.[1]  These arguments all rest on the same basic premise—that Earl should not be held responsible for the acts of his co-conspirators because Earl's involvement in the conspiracies was limited.

A defendant may be held responsible for the reasonably foreseeable acts of his co-conspirators in furtherance of the jointly undertaken criminal activity.  See Mateos, 623 F.3d at 1370–71.  To determine a defendant's accountability for the conduct of others, a sentencing court "must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake and then consider the conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant."  Petrie, 302 F.3d at 1290 (internal quotation marks omitted).  "[A] sentencing court's failure to make individualized findings regarding the scope of the defendant's activity is not grounds for vacating a sentence[, however,] if the record supports the court's determination with respect to the offense conduct, including the imputation of others' unlawful acts to the defendants."  Id.  Although the district court failed to make individualized findings regarding the scope of

---

[1] Earl briefly argues in his reply brief that the enhancement for the production or trafficking of any unauthorized access device should not apply to him because this conduct already is reflected in his conviction and separate sentence for aggravated identity theft, citing U.S.S.G. § 2B1.6, cmt. n.2.  Because Earl failed to present this argument to the district court or raise it in his opening brief, we do not consider it now.  See United States v. Mathis, 767 F.3d 1264, 1277 (11th Cir. 2014).

Earl's involvement in the conspiracy, we affirm because the record strongly supports imputing the acts of Earl's co-conspirators to him.

Earl argues that the evidence established that he engaged in only a small number of discrete transactions. As described above, however, at least fifty-eight fraudulent returns, totaling approximately $200,000 in requested refunds, were submitted from the address listed on Earl's driver's license. Several returns were also sent to this address. When Earl moved, returns continued to be filed from his new address. Earl also was captured by surveillance cameras on several occasions using cards connected with the scheme, one of which was in the name of an individual whose personal identity information was found in Earnest's vehicle. This evidence suggests that Earl agreed to participate fully in the broader scheme, rather than to engage in only a small handful of withdrawals. With the scope of Earl's involvement so defined, there can be little doubt that the acts that the district court attributed to Earl were in furtherance of the jointly undertaken criminal activity and were reasonably foreseeable by Earl.

Earl's reliance on our decision in United States v. Hunter, 323 F.3d 1314 (11th Cir. 2003), is misplaced. In Hunter, we vacated the sentences of several "runners" who were engaged in a counterfeit check cashing ring. Id. at 1316. We held that the district court erred in holding the runners accountable for the entirety of the loss caused by the ring without making individualized findings regarding the

30

scope of the criminal activity to which they agreed.  See id. at 1320.  We noted that although the defendants appeared to be aware that there was a much larger check cashing ring, the evidence showed that the defendants cashed only a handful of checks.  See id. at 1320–21.  There was no evidence suggesting that the defendants had any interest in the overall scheme beyond the small number of transactions in which they were involved.  See id. at 1320–22.  Here, a great deal of the fraudulent activity took place at Earl's residences, the co-conspirators included Earl's family members, and Earl received profits from the scheme.  This evidence tying Earl to the broader scheme is far more substantial than the evidence presented by the prosecution in Hunter.  Accordingly, we see no similar need to remand to the district court to make further findings.  See United States v. McCrimmon, 362 F.3d 725, 731–33 (11th Cir. 2004) (citing Petrie and directly examining trial record to affirm sentence while distinguishing Hunter on the basis that defendant's participation in fraudulent scheme was not comparable to degree of defendants' participation in scheme at issue in Hunter).

### 2.  Reasonableness of Sentence

Next, Earl argues that his sentence is procedurally and substantively unreasonable.  The reasonableness of a sentence is reviewed for abuse of discretion, Gall, 552 U.S. at 41, and the court will remand for resentencing only if the district court "committed a clear error of judgment in weighing the § 3553(a)

factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." United States v. Irey, 612 F.3d 1160, 1190 (11th Cir. 2010) (en banc).

Earl contends that his sentence is procedurally unreasonable because it was based on improper sentencing enhancements. As previously explained, Earl's sentencing enhancements were proper and thus Earl has failed to show that his sentence is procedurally unreasonable.

Earl argues that his sentence is substantively unreasonable because the district court failed to give proper weight to the factors in 18 U.S.C. § 3553(a).[2] Earl has not shown that his sentence was substantively unreasonable in the light of the totality of the circumstances and the § 3553(a) factors. See Gonzalez, 550 F.3d at 1324. The district court properly considered that the offense was particularly serious, given that over 1,000 individuals' identities, including the identities of disabled people and high school students, were compromised, and approximately $1,803,826 in fraudulent tax returns were requested over the course of the conspiracy. Further, given the harm caused to the community and to the government by the conspiracy, the need to promote respect for the law and the

---

[2] The § 3553(a) factors include the need to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to deter criminal conduct, and to protect the public from the defendant's future criminal conduct. 18 U.S.C. § 3553(a)(2). The factors also include the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the applicable guideline range, the pertinent policy statements of the Sentencing Commission, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims. Id. § 3553(a)(1), (3)–(7).

need to provide deterrence was high.  The district court, however, also considered Earl's PSI, which included information relative to Earl's personal history and characteristics, as well as letters submitted by Earl's family, and concluded that a downward variance from the proper guideline range was appropriate.  Relative to Counts 1 and 3, the district court downwardly departed from the proper guideline range of 78 to 97 months' imprisonment and imposed concurrent sentences of 60 months.  Moreover, Earl's sentence is well below the statutory maximum of 10 years' imprisonment for Counts 1 and 3.  See 18 U.S.C. §§ 286, 1029(c)(1)(A)(i); Gonzalez, 550 F.3d at 1324.  Earl's sentence accordingly is substantively reasonable, and he has not satisfied his burden of proving otherwise.  See Gonzalez, 550 F.3d at 1324; United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005) (noting that "the party who challenges the sentence bears the burden of establishing that it is unreasonable").

## 3.  Restitution Amount

Finally, Earl contends that the government failed to show that the $500,000 in loss for restitution purposes was attributable to him.  Pursuant to 18 U.S.C. § 3664(h):

> If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.

33

In the light of the evidence described above regarding Earl's culpability for purposes of calculating his sentence pursuant to the Sentencing Guidelines, we perceive no error in the district court's decision to make each defendant, including Earl, liable for payment of the full amount of restitution owed to the IRS.

## C. Lineten Belizaire

### 1. Application of Sentencing Guidelines

First, Belizaire argues that the district court erred in applying the U.S.S.G. § 2B1.1 guidelines. He maintains that the U.S.S.G § 2T guidelines are more applicable and would have resulted in a substantially shorter sentencing range than a calculation under § 2B1.1. We review the interpretation of the Sentencing Guidelines and its application to facts de novo. See Barrington, 648 F.3d at 1194–95.

After determining the offense of conviction, the court turns to the Sentencing Guideline's Statutory Index to determine the applicable offense guideline section. United States v. Saavedra, 148 F.3d 1311, 1315 (11th Cir. 1998). Once that guideline is selected, "relevant conduct is considered in determining various sentencing considerations within that guideline, including the base offense level, specific offense characteristics, and any cross-references." Id. at 1317.

34

Belizaire pleaded guilty to violating 18 U.S.C. § 286. The Statutory Index provides that U.S.S.G. § 2B1.1 applies when the statute of conviction is 18 U.S.C. § 286. See U.S.S.G. app. A. Section 2B1.1(c)(3) of the Sentencing Guidelines, however, provides that if a defendant was convicted under a general fraud statute and the conduct described in the count of conviction "establishes an offense specifically covered by another guideline in Chapter Two," the court should apply the other guideline. The commentary further explains that if the conviction is for "an offense involving fraudulent conduct that is more aptly covered by another guideline," the other guideline should be used. See U.S.S.G § 2B1.1, cmt. n.16.

Belizaire relies on United States v. Brisson, 448 F.3d 989, 992 (7th Cir. 2006), which in turn relied on the Third Circuit's opinion in United States v. Barnes, 324 F.3d 135, 139–40 (3rd Cir. 2003) and the Ninth Circuit's opinion in United States v. Aragbaye, 234 F.3d 1101, 1105–06 (9th Cir. 2000), for the proposition that the tax guidelines (U.S.S.G. § 2T) should apply to false claims for tax refunds. Those courts found that the § 2T guidelines may be appropriate when the "offense conduct was at heart a scheme to file fraudulent tax returns and thus could be considered on par with tax fraud." Brisson, 448 F.3d at 992 (quoting Aragbaye, 234 F.3d at 1105).

Here, the heart of Belizaire's scheme was not simply to file fraudulent tax returns, impede the IRS from collecting taxes, or counsel others to falsify their own

35

returns, like the crimes in Brisson, Barnes, and Aragbaye. Rather, Belizaire

unlawfully enriched himself by stealing identities, defrauding the victims by filing

false returns, and obtaining and using fraudulent debit cards in the victims' names

to receive the fraudulent returns. Although the conduct involved filing tax returns,

Belizaire's goal was to enrich himself by defrauding the government with entirely

fictitious tax returns, and thus the § 2B1.1 guidelines more aptly fit the specifics of

the crimes committed by Belizaire.[3] Cf. United States v. Anderson, 326 F.3d

1319, 1332 (11th Cir. 2003) (applying general fraud guideline over more specific

bid-rigging guideline, pursuant to cross reference in U.S.S.G. § 2X, because bid

rigging was "merely a means to an end," namely defrauding the government).

Belizaire further argues that if either section could cover the offense

conduct, the district court should have applied the § 2T guidelines pursuant to the

rule of lenity. Belizaire's argument is unpersuasive. To invoke the rule of lenity,

the court "must conclude that there is a grievous ambiguity or uncertainty in the

statute." Muscarello v. United States, 524 U.S. 125, 138–39 (1998) (internal

quotation marks omitted). There is no "grievous ambiguity or uncertainty in the

statute" that Belizaire can point to which would allow him to invoke this rule.

Assuming the offense conduct is covered by both guidelines, as Belizaire urges,

---

[3] The government also argues that 18 U.S.C. § 286 does not constitute the type of general fraud statute that would implicate the use of the cross reference in § 2B1.1(c)(3). We need not decide this issue because we find that Belizaire's offense conduct is more aptly covered by § 2B1.1.

36

the guidelines provide a clear solution.  Under U.S.S.G. § 1B1.1, "where two or more guideline provisions appear equally applicable, but the guidelines authorize the application of only one such provision, use the provision that results in the greater offense level."  U.S.S.G. § 1B1.1, cmt. n.5.

The district court thus did not err in applying U.S.S.G. § 2B1.1, the general fraud guideline, to determine Belizaire's offense level.

### 2.  Intended Loss

The district court attributed the entirety of the $1,803,826 in requested tax refunds to Belizaire, resulting in a sixteen-level increase based on an intended loss of greater than $1 million.  U.S.S.G. § 2B1.1(b)(1)(I).  Belizaire argues that he should not be responsible for the fraudulent returns filed between January 22, 2012, and March 2, 2012, because he was incarcerated during that time and, as a result, could not participate in "some of the most crucial fraudulent activities" of the conspiracy.

A defendant may be "responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy."  Mateos, 623 F.3d at 1370.  "[N]either arrest nor incarceration automatically triggers withdrawal from a conspiracy."  United States v. Gonzalez, 940 F.2d 1413, 1427 (11th Cir. 1991).  It was foreseeable that the other members of the conspiracy would continue to operate despite Belizaire's absence.  Belizaire, therefore, cannot claim that he

37

ceased being part of the conspiracy by virtue of his arrest.  Further, upon his

release, Belizaire continued to withdraw various sums of cash using the fraudulent

accounts.  These withdrawals demonstrate that he never ceased to be a part of the

overall conspiracy and is responsible for the losses incurred during his

incarceration.

### 3.  Managerial Role Enhancement

Belizaire argues that the district court erred in applying a sentencing

enhancement for his supervisory role in the conspiracy.  He contends that the

enhancement is not applicable because he was merely a "middleman" and did not

engage in recruitment of individuals to the conspiracy.

We review the district court's decision to enhance a defendant's offense

level based on his role in the offense for clear error.  United States v. Rendon, 354

F.3d 1320, 1331 (11th Cir. 2003).  It is the government's burden to prove "by a

preponderance of the evidence that the defendant had an aggravating role in the

offense."  United States v. Yeager, 331 F.3d 1216, 1226 (11th Cir. 2003).

The Sentencing Guidelines provide for a three-level enhancement to the base

offense level "[i]f the defendant was a manager or supervisor (but not an organizer

or leader) and the criminal activity involved five or more participants or was

otherwise extensive."  U.S.S.G. § 3B1.1(b).  To apply the enhancement "the

defendant must have been the organizer, leader, manager, or supervisor of one or

more other participants." U.S.S.G. § 3B1.1, cmt. n.2. "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." Id., cmt. n.l. Some factors the court may consider include:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

Id., cmt. n.4; see United States v. Njau, 386 F.3d 1039, 1041 (11th Cir. 2004) (noting that the district court could consider the factors in determining the nature of the defendants role). Belizaire does not dispute that the "criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). Rather, he disputes his role as a manager.

Belizaire's factual proffer accompanying his guilty plea indicates that he acted as a manager. Belizaire received names and social security numbers from co-conspirators for the purpose of submitting fraudulent returns. Belizaire also recruited other unindicted co-conspirators to obtain addresses of residences where the debit cards could be received. Further, Belizaire was deeply involved in the conspiracy. He sent and received victims' personal identification information used to file the fraudulent tax returns as well as debit card account numbers that were to be used for receiving the victims' tax refunds. Many of the fraudulent tax returns were also submitted from an IP address registered in Belizaire's name. Finally,

39

Belizaire made numerous withdrawals of the distributed returns with the debit cards.  Taking the factors prescribed by the statute into account, the district court did not clearly err in finding that Belizaire was a manager or supervisor of one or more participants.

### 4.  Number of Victims

Belizaire contends that the government failed to prove that there were more than 250 victims because it did not establish precisely how many tax returns contributed to the actual loss.  We review the district court's finding of the number of victims for clear error.  See United States v. Philidor, 717 F.3d 883, 885 (11th Cir. 2013).

The Sentencing Guidelines provide for a six-level enhancement to a base offense level if the crime involves 250 or more victims.  U.S.S.G. § 2B1.1(b)(2)(C).  For purposes of § 2B1.1, "'[v]ictim' means . . . any person who sustained any part of the actual loss" attributed to the crime.  U.S.S.G. § 2B1.1, cmt. n.1.  In cases involving means of identification, like Social Security numbers, "victim" also includes "any individual whose means of identification was used unlawfully or without authority."  Id., cmt. n.4(E).  A means of identification must be of an "actual (i.e., not fictitious) individual."  Id., cmt. n.1.

The district court determined that there were 250 or more victims affected by the conspiracy.  The undisputed facts in the Second PSI indicate that notebooks

40

seized from the vehicle driven by Earnest contained approximately 1,300 individuals' names, dates of birth, and Social Security numbers. The Second PSI indicated that the IRS, through the notebooks, discovered over 500 tax returns filed with stolen identity information for the 2010 and 2011 tax years. The district court reasonably could infer, "based on common sense and ordinary human experience, that the [IRS] verifies identifying information, like Social Security numbers, before issuing a tax refund." Philidor, 717 F.3d at 885–86. Further, "the fact that the [IRS] paid the refunds . . . indicates that the Social Security numbers used to procure those refunds [were] associated with real people." Id. at 886. The district court properly concluded that the identifying information used to file 500-plus tax returns matched actual individuals. Therefore, the determination that more than 250 victims' identities were used unlawfully or without their authority in connection with the conspiracy was not clearly erroneous.

### 5. Restitution Amount

Belizaire argues that because the government failed to make any specific showing regarding the exact dollar amount of loss sustained by the IRS, the restitution amount of $500,000 was clearly erroneous. This is the same argument raised by Earnest, and we reject it for the same reasons.

41

## <u>CONCLUSION</u>

For the foregoing reasons, the judgments of conviction and sentences of the

appellants are

**AFFIRMED.**