[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-13402
Non-Argument Calendar
_____

D.C. Docket No. 4:14-cr-00058-MW-CAS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PERRISSA DEDRANETTE DIXON,

Defendant-Appellant.
_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(January 3, 2017)

Before WILLIAM PRYOR, MARTIN, and FAY, Circuit Judges.

PER CURIAM:

Perrissa Dixon appeals the 132-month sentence she received based on her

conviction for conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343

and 1349, and aggravated identity theft and aiding and abetting in violation of 18

U.S.C. §§ 1028A(a)(1) and 2.  In particular, Dixon appeals the district court's 14-level enhancement for the amount of loss, under United States Sentencing Guidelines § 2B1.1(b)(1)(H), and the 2-level enhancement she received for the production of an unauthorized access device, under § 2B1.1(b)(11)(B)(i).  After careful review, we affirm.

## I.

Dixon pleaded guilty to conspiracy to commit wire fraud under 18 U.S.C. §§ 1343 and 1349, and aggravated identity theft and aiding and abetting under 18 U.S.C. §§ 1028A(a)(1) and 2.  Dixon's plea agreement contained a statement of facts detailing that she and her coconspirators filed fraudulent tax returns online using the personally identifiable information of others.  When officers searched Dixon's home, they found personal information for about 180 people, as well as twenty-seven debit cards obtained by using victims' names.  The debit cards were such that they could be loaded with refunds from fraudulent tax returns filed in the victims' names.  Victims told law enforcement they had not authorized filing the tax returns or issuing the debit cards.  In at least one case, a fax machine in Dixon's home was used to verify information needed for the issuance of the debit card with the refund money on it.  Dixon purchased some people's personal information from Katrina Pratt, who worked at Florida A&M University and had access to students' information.  The conspiracy claimed $877,042 in fraudulent refunds,

and the U.S. Department of Treasury actually paid $528,153 of that amount. $35,476.00 of the paid claims were directed or deposited into Dixon's accounts.

The district court sentenced Dixon to consecutive prison terms of 108-months for the conspiracy to commit wire fraud and 24-months for aggravated identity theft and aiding and abetting, resulting in her 132-month sentence. The court adopted the presentence investigation report ("PSR"), which calculated a total offense level of 33 with a criminal history category of I for a guideline range of 135 to 168 months on the conspiracy to commit wire fraud count. The court imposed the below-guideline sentence of 108 months on this count. The district court imposed a consecutive 24-month sentence for the aggravated identity theft and aiding and abetting count. The PSR calculation for the conspiracy to commit wire fraud count included a 14-level increase for a loss of more than $400,000 under USSG § 2B1.1(b)(1)(H) (2014); a 2-level increase for the production of an unauthorized access device under § 2B1.1(b)(11)(B)(i); and a 4-level increase because Dixon led a criminal activity that involved five or more participants under § 3B1.1(a). During the course of the sentencing hearing, the district court overruled Dixon's objections to the guidelines calculation. On appeal, Dixon challenges only the loss calculation that resulted in a 14-level increase in her guideline range, as well as the 2-level increase for production of an unauthorized

access device.  We thus restrict our discussion of the sentencing hearing to those rulings.

At the sentencing hearing, the district court "[found] that the Government has more than met its burden to establish that . . . the loss [was] in excess of [$]400,000."  In support of this decision, the district court pointed to two IP addresses used to file the fraudulent tax returns, one linked to Dixon's residence and the other linked to accounts and information connected to Dixon.  The court further pointed to Pratt's testimony that she gave students' personal information to Dixon, and to the tax returns filed fraudulently for those students in successive years.  The district court noted common patterns in the information put into the fraudulent returns, including wage and withholding amounts.  The court explained none of the facts alone were dispositive, but taken together they created a "convincing mosaic of circumstantial evidence . . . that ties [Dixon] squarely to these addresses, squarely to these tax returns, and squarely to these individuals whose identities were being used."  The district court rejected Dixon's argument that she should be sentenced only for the money put into her account, saying "the standard is clearly reasonably foreseeable acts of conspirators in furtherance of the conspiracy."  The court noted that Dixon did not need to file or benefit from each tax return in order for those acts to be reasonably foreseeable.

4

The district court also overruled Dixon's objection to the 2-level increase for production of an unauthorized access device.  It noted there was evidence of production of devices including debit cards.  The court specifically listed the debit cards found during the search of Dixon's home, as well as two exhibits of debit-card records produced at sentencing.

## II.

We review the district court's factual findings, including the loss calculation and the finding that Dixon produced an unauthorized access device, for clear error. See United States v. Taylor, 818 F.3d 671, 673 (11th Cir. 2016); United States v. Baldwin, 774 F.3d 711, 727–28 (11th Cir. 2014).

The district court applied the Guidelines and determined that a 14-level increase was appropriate under USSG § 2B1.1 because there was a loss greater than $400,000.  Section 2B1.1 defines loss as the greater of actual or intended loss. USSG § 2B1.1 cmt. n.3(A).  It defines actual loss as "the reasonably foreseeable pecuniary harm" resulting from the offense.  Id. cmt. n.3(A)(i).  And it defines "reasonably foreseeable pecuniary harm" as monetary harm "that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."  Id. cmt. n.3(A)(iii–iv).

The district court increased Dixon's sentence due to her leadership role in the conspiracy, finding she recruited others into the conspiracy.  It also found that

Dixon got the personal information for a number of victims from Pratt. These victims' tax returns were filed during several years of the conspiracy, tying Dixon to the conspiracy for at least that period of time. The district court also linked two IP addresses used to file the fraudulent tax returns to Dixon. And the district court pointed out common patterns in the information put into the returns, including wage and withholding amounts.

Dixon argues the district court erred by not making sufficient individualized findings that all the actions of the coconspirators were within the scope of the conspiracy. She says the district court should have sentenced her based on only the $35,476 directly in her control. Dixon also submits that ten people lived in the residence connected to the IP address, and that there was no testimony about the refund amounts her codefendants received.

Dixon does not demonstrate the district court clearly erred. "A district court may hold participants in a conspiracy responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy." United States v. Mateos, 623 F.3d 1350, 1370 (11th Cir. 2010) (quotation omitted). But "[a] district court must determine the scope of the defendant's criminal activity prior to considering all reasonably foreseeable acts of co-conspirators." Baldwin, 774 F.3d at 727. The district court made individualized findings about Dixon and

6

her role in the conspiracy linking her to its entire scope. Thus, the loss attributed to the entire conspiracy was reasonably foreseeable to her.

## III.

The district court also enhanced Dixon's guideline range by 2-levels for producing an unauthorized access device. U.S.S.G. § 2B1.1(b)(11)(B)(i). This Court's precedent provides that unauthorized debit cards are unauthorized access devices. Baldwin, 774 F.3d at 722, 728 (citing 18 U.S.C. § 1029(e)(1)).

The district court found evidence of production of devices such as debit cards. It ruled that the debit cards found at Dixon's home together with the two exhibits of debit-card records introduced at sentencing suggested Dixon produced the cards.

Dixon argues these cards and records are not sufficient to conclude she produced the cards herself. She also points out the district court did not find the production of the cards was reasonably foreseeable to her.

We uphold this sentencing enhancement because it is clearly supported by the record. See United States v. Hesser, 800 F.3d 1310, 1330 (11th Cir. 2015) (per curiam); United States v. Taylor, 88 F.3d 938, 944 (11th Cir. 1996). The record clearly demonstrates that the production of debit cards was reasonably foreseeable to Dixon. See Baldwin, 774 F.3d at 728. She pleaded guilty to a conspiracy that used victims' personal information to file fraudulent tax returns and load their

refunds onto debit cards opened in their names.  Twenty-seven of these debit cards were seized in Dixon's home, and the fax machine in her home was used to get at least one of these cards.  The record therefore clearly includes enough evidence to show Dixon could reasonably foresee the production of the debit cards for the conspiracy.  See USSG § 2B1.1 cmt. n.10(A) ("'Production' includes manufacture, design, alteration, authentication, duplication, or assembly.").  The district court did not err in sentencing Dixon.

**AFFIRMED.**