[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-12262
_____

D.C. Docket No. 8:14-cr-00054-CEH-AAS-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROSA ENEDIA PAZOS CINGARI,
DOMENICO CINGARI,

Defendants-Appellants.
_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(March 17, 2020)

Before JORDAN, GRANT, and SILER,[*] Circuit Judges.

GRANT, Circuit Judge:

---

[*] Honorable Eugene E. Siler, Jr., Senior United States Circuit Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

Defendants Domenico and Rosa Cingari, a husband and wife who defrauded hundreds of undocumented aliens into paying about $740,000 for falsified federal immigration forms, contest their sentences.  They say that they should not be jointly and severally liable for the forfeiture judgment in the amount that they collected in their scheme; that way, one of them could be liable for some "minimal amount," allowing them to pay off that liability and then "live their lives" as "a happily married couple."  Additionally, they say, they should be sentenced under the lesser penalty set out for falsifying immigration forms rather than the greater penalty set out for fraud and deceit.  Because the district court committed no plain error in holding them jointly and severally liable for repaying the proceeds of their illegal conduct, and because the Sentencing Guidelines direct that they be sentenced for fraud and deceit, we affirm the judgment of the district court.

## I.

### A.

For more than four years, migrant workers and other aliens went to the Cingaris' business looking for help getting Florida driver's licenses.  The Cingaris had apparently mastered the art of obtaining a key Department of Homeland Security document formally known as a Form I-797C Notice of Action, but nicknamed "the torch" for its torch watermark.  Under Florida law, aliens can use "the torch" to prove their identity and lawful status for licensing purposes.  *See* Fla. Stat. § 322.08(2)(c)(8).

Those coming to the Cingaris for help knew the couple could get them the document; what they did not know was how the Cingaris did it.  To obtain a Form

2

I-797C, the Cingaris would fill out and mail two other kinds of federal immigration documents: (1) a Form I-589 application for asylum and withholding of removal, and (2) a Form I-130, a document used to establish a relationship between a citizen (or lawful permanent resident) and an alien.  Once DHS received these two forms, it would generally issue a Form I-797C.

Without the applicants' knowledge, the Cingaris would often alter the facts provided in applications.  Some falsely reported that an applicant had suffered persecution, while others manufactured a false identity.  Still others lied about the applicant's lawful status, residential address, and social security number.  On each fraudulent application, the Cingaris listed their own business address as the applicant's mailing address, so that they, rather than the applicant, could correspond with the federal government.  As several applicants would later testify, they paid the Cingaris to procure the torch document—but would not have done so if they had known about the couple's deceptive practices.

The Cingaris' scheme left behind hundreds of victims.  But it also produced a small fortune.  During the conspiracy, the Cingaris filed forms for more than 1,000 aliens and usually charged $500–$800 per application.  Both spouses fraudulently completed forms, with Domenico personally working on at least 200.  All in all, as a direct result of the fraudulent conspiracy, the victims lost more than $791,000.  Of that, about $740,000 went to the Cingaris, with the remainder going to immigration attorney fees.  Some victims paid a much higher price: several were deported because the Cingaris—who, you will recall, intercepted all application-

3

related mail—failed to advise applicants when the federal government demanded interviews or requested information about an application.

### B.

Domenico and Rosa were tried by jury and convicted of three crimes: (1) falsifying immigration forms, in violation of 18 U.S.C. §§ 2 and 1546(a); (2) mail fraud, in violation of 18 U.S.C. §§ 2 and 1341; and (3) conspiracy to do the same, in violation of 18 U.S.C. § 371.

For their crimes, the Cingaris were sentenced to prison and held jointly and severally liable for a money judgment. "Based on the evidence presented at trial," the district court found that "the Defendants received criminal proceeds in the amount of $740,880.00." Consistent with that conclusion, the court ordered that "the Defendants shall be held jointly and severally liable for a forfeiture money judgment in the amount of $740,880.00." *Cf.* 18 U.S.C. §§ 982(a)(6) (criminal asset forfeiture), 981(a)(1)(C) (civil asset forfeiture); 28 U.S.C. § 2461(c) (allowing forfeiture, including under 18 U.S.C. § 981(a)(1)(C), in criminal proceedings). At that point, the Cingaris did not object to the imposition of joint and several liability.

The district court also sentenced them to prison. The presentence investigation report (PSR) initially recommended that the Cingaris be sentenced under § 2L2.1 of the United States Sentencing Guidelines. According to the PSR calculations, the sentencing range under that guideline was 30–37 months.

Both the Cingaris and the government objected to portions of the PSR. As relevant here, Domenico argued that because he played an insignificant role in the

4

criminal conspiracy, he should receive a minor-role reduction in his sentence. In arguing for this reduction, Domenico's trial attorney told the district court that he supposed that "the money is going into the family coffers," recognized that "there really has been no testimony as to . . . how they divided it under the circumstances," and conceded that the court could "assume that he did benefit to a point because he was married to Mrs. Cingari." Domenico also objected to the PSR's factual representation that he had operated the business together with Rosa. The district court overruled both objections.

For its part, the government argued that the Cingaris' sentence should be calculated under § 2B1.1, rather than § 2L2.1 as suggested in the PSR. Section 2L2.1 applies specifically to the criminal offense of falsifying federal immigration documents, while § 2B1.1 applies generally to offenses involving deception and fraud. U.S. Sentencing Guidelines §§ 2L2.1, 2B1.1 (Nov. 2016). Section 2B1.1 would also result in a higher sentencing range for the Cingaris: 168–210 months for Rosa, and 108–135 months for Domenico. Only that guideline, the government contended, could account for the totality of the Cingaris' criminal scheme—their deception of both the federal government *and* their victims. The Cingaris conceded that § 2B1.1 applied, at least as an initial matter, but contended that § 2L2.1 was the right provision in the end because of § 2B1.1's cross reference. That cross reference, they said, directs the court to apply § 2L2.1 where the conviction conduct establishes the offense of falsifying immigration forms, an offense "specifically covered" by § 2L2.1. *See* U.S.S.G. §§ 2B1.1(c)(3)(C), 2L2.1.

Agreeing with the government, the Probation Office amended the PSR to recommend sentencing the Cingaris under § 2B1.1 rather than § 2L2.1. The district court also agreed with the government, and sentenced the Cingaris within the higher sentencing range set out in § 2B1.1. "Although making false statements in the immigration applications [was] certainly a component of the mail fraud charges," the district court explained, "the Cingaris' ultimate goal was to obtain money from their clients." The Cingaris now appeal.

## II.

When a party does not object to an issue at sentencing, we review only for plain error. *United States v. Beckles*, 565 F.3d 832, 842 (11th Cir. 2009). The party raising the issue on appeal has the burden to show that "(1) there is an error; (2) that is plain or obvious; (3) affecting his substantial rights in that it was prejudicial and not harmless; and (4) that seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *Id.* (punctuation and citation omitted). We review de novo the interpretation and application of the Sentencing Guidelines. *United States v. Fox*, 926 F.3d 1275, 1278 (11th Cir. 2019).

## III.

### A.

The Cingaris first argue that the district court erred in holding them jointly and severally liable. But because they did not raise this issue below, the plain error standard applies. "As we have repeatedly recognized, an error cannot meet the 'plain' requirement of the plain error rule if it is not clear under current law."

*United States v. Castro*, 455 F.3d 1249, 1253 (11th Cir. 2006) (per curiam) (citation omitted).  The Cingaris have failed to make this showing.

As their chief support for the law's clarity, the Cingaris point to the Supreme Court's recent decision in *Honeycutt v. United States*, 137 S. Ct. 1626 (2017).  In *Honeycutt*, the Court rejected the idea that a defendant can be jointly and severally liable under 21 U.S.C. § 853 "for property that his co-conspirator derived from the crime but that the defendant himself did not acquire."  *Id.* at 1630.  Honeycutt, a salaried employee at his brother's store, sold large amounts of a product that the police had told him could be used to make methamphetamine; he was later convicted of several drug-related crimes.  *Id.* at 1630.  The Court held that he could not be jointly and severally liable with his brother for the profits from the illegal sales because § 853 requires forfeiture of "'any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of' certain drug crimes."  *Id.* at 1630 (quoting 21 U.S.C. § 853).  "Neither the dictionary definition nor the common usage of the word 'obtain' supports the conclusion that an individual 'obtains' property that was acquired by someone else."  *Id.* at 1632.  And even the government acknowledged that Honeycutt did not benefit personally from the product's sale—the profits went to his brother.  *Id.* at 1630–31.[1]

---

[1] Although *Honeycutt* was decided after the court below imposed joint-and-several liability, we analyze the plainness of an alleged error "at the time of appellate consideration," at least when "the law at the time of trial was settled and clearly contrary to the law at the time of appeal." *United States v. Rodriguez*, 398 F.3d 1291, 1299 (11th Cir. 2005) (citation omitted).

But *Honeycutt* cannot establish that imposing joint-and-several liability here was an obvious error.  Even if we assume that *Honeycutt* applies to criminal forfeiture under 18 U.S.C. § 982(a)(6)[2]—one of the statutory provisions authorizing forfeiture here—the Cingaris must also show that it plainly applies to civil asset forfeiture under 18 U.S.C. § 981(a)(1)(C)—the other provision independently authorizing forfeiture in this case.[3]  They cannot.  *See United States v. Brown*, 947 F.3d 655, 682 (11th Cir. 2020).  "*Honeycutt* was highly dependent on language found in 21 U.S.C. § 853 but absent from 18 U.S.C. § 981."  *Id.*  That textual difference, as we recently held, is "fatal" to the plain error argument the Cingaris advance.  *Id.*[4]

Besides, even if *Honeycutt* applied to both § 982(a)(6) and § 981(a)(1)(C), the Cingaris have not shown that its analysis plainly applies to them.  The Court's analysis in *Honeycutt* turned on the employer–employee relationship: the employer, as owner of the business, obtained the profits; the salaried employee

---

[2] We have not applied *Honeycutt* to § 982(a)(6), but we have applied it to the similarly worded provision in 18 U.S.C. § 982(a)(7).  *United States v. Elbeblawy*, 899 F.3d 925, 941–42 (11th Cir. 2018).

[3] The civil asset forfeiture statute was at play in this criminal case because of 28 U.S.C. § 2461(c).  *See United States v. Padron*, 527 F.3d 1156, 1161–62 (11th Cir. 2008) ("Congress enacted 28 U.S.C. § 2461(c) . . . to make criminal forfeiture available in every case that the criminal forfeiture statute does not reach but for which civil forfeiture is legally authorized.").

[4] Although we conclude that *Honeycutt* does not obviously extend to at least one of the forfeiture statutes at issue, we note that the government attempted to expressly waive this argument (while also setting out other reasons to hold the Cingaris jointly and severally liable).  But we cannot find plain error where none existed simply because one party wishes not to contest the point.  The Cingaris bear the burden to establish plain error, and we will not hold that the district court plainly erred just because the parties say so.  *See Beckles*, 565 F.3d at 842 (burden is on the party raising a new issue).

8

never saw the fruits of his criminal labor.  Here, though, the Cingaris are spouses—spouses who jointly operated their fraudulent business.  And contrary to Domenico's argument that he played an insignificant role in the crime, the evidence demonstrated that he personally worked on at least 200 fraudulent applications.  With this evidence in mind, the district court unsurprisingly ruled that Domenico did not merit a minor-role reduction in his sentence; Domenico does not challenge that finding on appeal.

More to the point, no evidence shows that the married couple split their co-earned criminal proceeds.  In fact, the district court found that "as a result of the conspiracy and fraud offenses, the Defendants received criminal proceeds in the amount of $740,880.00."  Although that statement is not *necessarily* a finding of joint ownership of the proceeds, in light of the context—a married couple jointly operating a fraudulent business—the best reading supports that conclusion.  Even Domenico's trial attorney understood that "the money is going into the family coffers," recognized that "there really has been no testimony as to . . . how they divided it under the circumstances," and thought the court "can assume that he did benefit to a point because he was married to Mrs. Cingari."  Under these circumstances, the Cingaris have failed to establish that they did not mutually obtain, possess, and benefit from their criminal proceeds.  We see no plain error.

### B.

Next, the Cingaris challenge their sentence as procedurally unreasonable, arguing that the district court's sentencing calculation was incorrect.  *See United States v. Williams*, 526 F.3d 1312, 1322 (11th Cir. 2008) (per curiam).  They say

that they should have been sentenced under § 2L2.1, instead of § 2B1.1.  Although their argument requires close consideration, it ultimately fails.

To calculate an offense level, a district court first "must determine which offense guideline section covers the offense of conviction."  *United States v. Belfast*, 611 F.3d 783, 824 (11th Cir. 2010) (citations omitted).  This requires the court to consult the Sentencing Guidelines Statutory Index, which matches particular guidelines to specific statutory violations.  *Id.*; *see* U.S.S.G. app. A.  Section 2B1.1 applies to the Cingaris' mail-fraud convictions, while § 2L2.1 applies to their immigration-document convictions.  For multi-count convictions, a district court must also group "[a]ll counts involving substantially the same harm."  U.S.S.G. § 3D1.2.  After that, the court must apply the guideline that produces the highest offense level.  U.S.S.G. § 3D1.3.  Because the guideline for mail fraud produced a higher offense level than the guideline for falsifying immigration documents, the court below applied § 2B1.1.

But as the Cingaris see it, § 2B1.1 is a beginning rather than an end.  They contend that § 2B1.1's cross-reference provision applies—and requires that they be sentenced under § 2L2.1, which covers the offense of falsifying immigration forms.  According to its text, § 2B1.1's cross reference triggers application of § 2L2.1 only if the "conduct set forth in the count of conviction establishes an offense specifically covered by" § 2L2.1.  U.S.S.G. § 2B1.1(c)(3)(C).  The Cingaris say that, luckily for them, the conduct of lying on immigration forms is specifically covered by § 2L2.1.  So that provision—which happens to yield a much lighter sentence—covers this case (or so they argue).

10

The government counters with precedent and Guidelines commentary.  It first leans on our decision in *United States v. Baldwin*, where we upheld the district court's application of § 2B1.1 on facts comparable to those here.  774 F.3d 711, 733 (11th Cir. 2014).  The government also points to the language of the Guidelines commentary, which states that the cross reference applies only when a defendant's conduct qualifies as an offense "involving fraudulent conduct that is more aptly covered by another guideline."  U.S.S.G. § 2B1.1 cmt. n.16.[5]  We agree—under those authorities, the district court rightly sentenced the Cingaris under § 2B1.1.

1.

*Baldwin* controls this case.  There, we upheld a sentence under § 2B1.1 because we found that it (rather than another guideline) "more aptly fit the specifics of the crimes committed."  *Baldwin*, 774 F.3d at 733.  One of the defendants, Belizaire, had participated in a fraudulent scheme to steal victims' identities, file false tax returns, and obtain and use debit cards loaded with fraudulent tax refunds.  *Id.* at 720.  He pleaded guilty to conspiracy to defraud the government in violation of 18 U.S.C. § 286.  *Id.*  Although that offense was covered by Guidelines § 2B1.1, Belizaire argued that the district court should have applied § 2B1.1's cross reference and sentenced him under § 2T, a provision specifically addressing fraudulent tax returns.  This Court rejected that argument: "the heart of Belizaire's scheme was not simply to file fraudulent tax returns,

---

[5] This language is now in footnote 17 of the most recent Guidelines commentary.  U.S.S.G § 2B1.1 cmt. n.17 (Nov. 2018).

impede the IRS from collecting taxes, or counsel others to falsify their own returns." *Id.* at 733.  Rather, "Belizaire's goal was to enrich himself by defrauding the government with entirely fictitious tax returns, and thus the § 2B1.1 guidelines more aptly fit the specifics of the crimes committed by Belizaire." *Id.*

That case is this case in every meaningful respect.  Like in *Baldwin*, the "heart" of the Cingaris' scheme was not simply falsifying federal forms; instead, their "goal was to enrich" themselves through a fraudulent scheme, cheating aliens out of several hundred thousand dollars.  That much is undisputed.  We hold here as we held there: the "§ 2B1.1 guidelines more aptly fit the specifics of the crimes committed," and thus apply.

Despite the similarities between *Baldwin* and this case, the Cingaris try to limit *Baldwin* by arguing that the opinion seemed to assume, but not actually decide, that the guideline and commentary were consistent.  Not so.  Key to our holding was our determination that the text of § 2B1.1(c) harmonized with its commentary.  As we put it, the "commentary further explains" the text.  *Id.*  That is, our Court decided that the commentary was a consistent explanation of—rather than in contradiction to—the guideline itself, and then decided the case on that ground.  We could not today hold that the text and commentary were inconsistent without running headlong into this express determination, effectively overruling *Baldwin*.

The Cingaris' argument amounts to asserting that *Baldwin* does not apply because it did not consider the "inconsistency exception" that prevents the commentary from being authoritative.  To be sure, otherwise authoritative

12

commentary loses that status if it is "inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993). That said, the Cingaris' argument is a non-starter. Even if we agreed with their view that the guideline and commentary were inconsistent, we could not free ourselves from a binding opinion just because it "failed to consider" an "exception to the general rule." *Smith v. GTE Corp.*, 236 F.3d 1292, 1301 (11th Cir. 2001). Doing so would risk "nullifying the well-established prior panel precedent rule that is an essential part of the governing law of this Circuit." *Id.* at 1302. We therefore follow *Baldwin*.

2.

And even if *Baldwin* did not bind us, we cannot say that the outcome would be different. A closer look at the text and commentary of the Guidelines shows why.

First, some background on our approach. "To properly interpret the Sentencing Guidelines, we begin with the language of the Guidelines, considering both the Guidelines and the commentary." *United States v. Panfil*, 338 F.3d 1299, 1302 (11th Cir. 2003) (per curiam) (citations omitted). We have explained that "the guideline and the commentary must be read together," because the commentary may "interpret the guideline or explain how it is to be applied." *United States v. Ferreira*, 275 F.3d 1020, 1029 (11th Cir. 2001) (quotation marks and citations omitted); *Stinson*, 508 U.S. at 41 (alteration omitted) (quoting U.S.S.G. § 1B1.7 (Nov. 1989)). The commentary sometimes requires interpreting a guideline in a way that "may not be compelled by the guideline text." *Stinson*,

13

508 U.S. at 47.  Yet the commentary for a guideline remains authoritative "unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."  *Id.* at 38.  Courts should thus "seek to harmonize" a guideline's text with its commentary.  *United States v. Genao*, 343 F.3d 578, 584 n.8 (2d Cir. 2003) (citation omitted).

Turning to the text of § 2B1.1, we see that courts must apply some other guideline only when "the conduct set forth in the count of conviction establishes an offense specifically covered" by that other guideline.  U.S.S.G. § 2B1.1(c)(3)(C).  And at least two conditions must be met to trigger the cross reference: (1) the conviction conduct must establish some other offense and (2) that offense must be "specifically covered" by another guideline.  But what the language does not state is whether another guideline must capture all, the core, or only some insignificant part of the conviction conduct before the cross reference applies.

The commentary, though, does not leave us guessing on this point.  It states that the cross reference applies only when "the count of conviction establishes an offense involving fraudulent conduct that is more aptly covered by another guideline."  U.S.S.G. § 2B1.1 cmt. n.16.  In other words, offense conduct matters, and the cross reference is triggered only if another guideline accounts for it.

Although the Cingaris zoom in on the phrase "specifically covered" and contrast it with the commentary's use of "more aptly covered," these phrases are connected to distinct nouns: another *offense* established must be "specifically covered" elsewhere, and the *conduct* "involv[ed]" with that offense must be "more aptly covered."  It is not as if the conduct-focused approach somehow overrides the

14

requirement that the offense be specifically covered.  Several courts have held that another guideline specifically covers an offense only when the conduct set forth in the count of conviction establishes the elements of the offense.  *See, e.g.*, *United States v. Bah*, 439 F.3d 423, 427 (8th Cir. 2006) (quoting *Genao*, 343 F.3d at 583).  That is perfectly consistent with requiring that the core fraudulent conduct *likewise* be covered.  Granted, the commentary's conduct-focused approach "may not be compelled by the guideline text," but neither does the guideline foreclose that approach.  *Stinson*, 508 U.S. at 47.

In fact, two structural clues indicate that the commentary's conduct-focused reading is not only permissible but also best.  *First*, the Commission designed § 2B1.1 to account for harm to victims.  For example, the guideline increases the offense level based on the amount of money victims lost, the number of affected victims, and whether their loss "resulted in substantial financial hardship."  *See* U.S.S.G. § 2B1.1(b)(1)–(2).  Although § 2B1.1 would understandably require sentencing under some other provision that fully captured the relevant harmful conduct, we doubt the guideline would ignore the core offense conduct for cross-reference purposes.

*Second*, the commentary's construction accords better with the Sentencing Guidelines' efforts to match offense conduct to a proportional sentencing range.  Indeed, the first step in calculating a Guidelines range is to determine the offense guideline section "applicable to the offense of conviction (*i.e.*, the offense conduct charged in the count of the indictment or information of which the defendant was convicted)."  U.S.S.G. § 1B1.2(a); *see id.* § 1B1.1(a)(1).  And the Guidelines

presume that cross references "shall be determined on the basis" of "all acts and omissions committed" by a defendant during a crime and even the acts of others for certain "jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a). True, § 2B1.1's cross reference turns on a more limited set of conduct—the "conduct set forth in the count of conviction." U.S.S.G. § 2B1.1(c)(3)(C). Still, against the Guidelines' general instruction to consider all relevant conduct in determining whether cross references apply, we would hesitate to conclude that in the case of this particular guideline only some insignificant part of the conviction conduct must be covered—even if the commentary had not closed that interpretive door.

In light of these structural hints, the Cingaris' reading would produce strange—if not absurd—results. "The oddity or anomaly of certain consequences may be a perfectly valid reason for choosing one textually permissible interpretation over another . . . ." Antonin Scalia & Bryan A. Garner, *Reading Law* 237 (2012). Suppose, for instance, that the Cingaris had falsified federal immigration forms, but had done so with the knowledge and assistance of their customers. In that case, they would have committed the crime of falsifying immigration forms, but would not have defrauded hundreds of victims. For that lesser (albeit still serious) crime, the Cingaris would have been sentenced under § 2L2.1, the same provision they would have us apply today.

On the other hand, imagine that the Cingaris found a way to defraud their victims using mail services, but had not falsified immigration forms. They would probably be sentenced for mail fraud under § 2B1.1, with its harsher range. But they would have us impose a lighter sentence here because they committed a

16

*second* criminal act of lying on immigration forms. Ordinarily, criminals are not so lucky as to receive a reduced sentence for piling on more criminal activity.

We are similarly unpersuaded by the Cingaris' argument that the guideline's text and its commentary are inconsistent. They rely on a Second Circuit case, *United States v. Genao*, to show a contradiction. 343 F.3d at 583–84. But that case does not support their position. In *Genao*, the Second Circuit held that the cross reference "is applicable only if the elements of another offense are established by conduct set forth in the count of conviction." 343 F.3d at 584. Although the court noted a "tension" between the text and commentary, that tension has since been resolved. *Id.* at 584 n.8. At the time *Genao* was decided, the cross-reference's text applied only if the conduct established "an offense specifically covered by another guideline"; the commentary also instructed that cross-reference applied only if the conduct established "an offense more aptly covered by another guideline." *Id.* at 583 & 584 n.8 (emphasis omitted) (quoting U.S.S.G. § 2B1.1(c)(3) & n.11 (2002)). In other words, both the text and commentary of the guideline sought to modify the same word—offense—but with different limiting phrases ("specifically covered" versus "more aptly covered"). But as explained above, now the text's "specifically covered" language addresses the word "offense," while the commentary's "more aptly covered" phrase modifies "conduct."

Moreover, that case is the inverse of this one in two respects: there, the government tried to use the cross reference to attain a higher sentence, using offense conduct that was insufficient to establish all the elements of the other

17

guideline. *Id.* at 583–84. Here, in contrast, the sentence would be lighter if the cross reference applied, and the offense covered by the alternative guideline is not broad enough to capture the conduct.

Nor are we persuaded by the Cingaris' lenity argument. They rightly acknowledge that, if both § 2L2.1 and § 2B1.1 apply, the district court should have applied § 2B1.1. After all, "the guidelines provide a clear solution" when "offense conduct is covered by both guidelines"—"use the provision that results in the greater offense level." *Baldwin*, 774 F.3d at 733 (quoting U.S.S.G. § 1B1.1 cmt. n.5)). Still, the Cingaris argue that the rule of lenity applies because reading the guideline with its commentary creates ambiguity.

Their contention rests on a shaky assumption: "Whether the rule of lenity can be applied to the non-statutory advisory Sentencing Guidelines is an open question upon which this Court has cast doubt." *United States v. Watts*, 896 F.3d 1245, 1255 (11th Cir. 2018). At any rate, the Supreme Court has "repeatedly stated that the rule of lenity applies only if, after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended"—that is, the court "must conclude that there is a grievous ambiguity or uncertainty." *Holloway v. United States*, 526 U.S. 1, 12 n.14 (1999) (punctuation and citation omitted); *Muscarello v. United States*, 524 U.S. 125, 138–39 (1998) (quotation marks and citation omitted). Interpreting the cross-reference provision in light of its authoritative commentary does not leave this Court with a mere "guess" and does not create "a grievous ambiguity or uncertainty." Far from it. "Because the Sentencing Commission's intent is clear, we need not address the

18

rule of lenity" any further.  *United States v. Wright*, 607 F.3d 708, 713 (11th Cir. 2010).

*     *     *

In short, the Cingaris' challenges fail.  They cannot show that the district court plainly erred in holding them jointly and severally liable.  Nor can they convince us that they were wrongly sentenced: our binding precedent and authoritative Guidelines commentary compel the opposite conclusion.  We **AFFIRM** the judgment of the district court.