[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11948

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JOSHUA MAYWALT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:20-cr-00347-MSS-TGW-1

_____

Before WILSON, NEWSOM, and LUCK, Circuit Judges.

PER CURIAM:

Joshua Maywalt appeals his 65-month prison sentence for healthcare fraud, aggravated identity theft, filing a fraudulent tax return, and failure to file tax returns. He argues that the district court erred by failing to group his fraud and tax offenses together under guideline section 3D1.2(d) when it calculated his total offense level. Maywalt also contests Standard Condition 12 of his supervised release. After careful review, we affirm.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Maywalt worked for a company that provided credentialing and medical billing services. His job granted him access to the company's financial, medical provider, and patient information. Maywalt was responsible for submitting claims to Florida Medicaid for services rendered by a particular physician. From approximately February 2017 through October 2018, Maywalt used the physician's unique identifier to submit false and fraudulent claims to Florida Medicaid HMO #1 for services supposedly rendered to a fake Medicaid patient. He routed payments for the false medical services to his own bank accounts. In total, Maywalt submitted approximately 1,738 false and fraudulent claims, and Medicaid unwittingly paid him $2,250,996.74.

These converted funds went unreported and underreported to the IRS. The resulting total tax loss to the government for tax years 2017–2019 was $779,216.75. In 2017, Maywalt's gross income

from the fraudulent claims was $416,434.84, but he did not file a tax return for that year. His tax deficiency for 2017 was $120,822.25. In 2018, Maywalt's gross income from the fraudulent claims paid by Medicaid was $1,840,595.02, but he did not file a tax return for that year, either. The tax deficiency for 2018 was $646,709.50. The parties agreed to lower the Medicaid loss amount from $2,257,029.86 to $2,250,996.74. From April 2019 to September 2019, Maywalt was hired at a second company where he was responsible for in-house billing. Maywalt diverted $55,374 from that company's business bank account into his own account. Maywalt underreported the diverted amount in his tax return for 2019, and the tax deficiency was $11,685.

In 2021, Maywalt pleaded guilty to four counts of defrauding a healthcare benefits program (counts one through four), four counts of aggravated identity theft (counts five through eight), one count of filing a fraudulent tax return (count nine), and two counts of failing to file an income tax return (counts ten and eleven).

The probation officer prepared a presentence investigation report that grouped counts one through four together (Count Group One) under guideline section 3D1.2(d). It also grouped counts nine through eleven (Count Group Two) under section 3D1.2(d). Counts five through eight were not grouped. Count Group One's adjusted offense level was 24, as calculated under section 2B1.1, and Count Group Two's adjusted offense level was 22, as calculated under sections 2T1.1 and 2T4.1. The probation officer recommended a combined adjusted offense level of 26

pursuant to section 3D1.4, by taking the group with the highest of-fense level (Count Group One) and increasing its offense level (24) by two units, because Count Group Two was from one to four lev-els less serious than Count Group One.  Then, Maywalt's com-bined adjusted offense level was decreased by three levels due to his acceptance of responsibility, resulting in a total offense level of 23.  With a total offense level of 23 and a criminal history category of II, the advisory guideline range was 51 to 63 months for Count Groups One and Two, plus 24 months consecutive for counts five through eight.[1]

Maywalt objected to the probation officer's refusal to group his fraud and tax counts together under section 3D1.2(d), arguing that those counts all "involve[d] substantially the same harm" and section 3D1.2(d)'s plain text required grouping.  He asserted that the PSI's grouping error increased his offense level by two, and that his correct offense level was 21, not 23.

The district court overruled Maywalt's objection and sen-tenced him to a total of 65 months' imprisonment:  41 months for counts one through four, 24 months for count nine, and 9 months for counts ten and eleven, all to run concurrently; and 24 months

---

[1] Maywalt argued that his criminal history category of II overrepresented his criminal history.  The district court granted a departure, finding that May-walt's DUI probation that occurred during his fraud did not speak to his "like-lihood to recidivate in regard to the offense for which he would be enhanced." The departure put Maywalt's criminal history category at I, and his guideline range was 46 to 57 months' imprisonment for Count Groups One and Two, plus 24 months consecutive to that for counts five through eight.

for counts five through eight, concurrent with each other but consecutive to the other counts.  The district court imposed a three-year term of supervised release and stated that "[w]hile on supervised release you will comply with the mandatory and standard conditions adopted by the Middle District of Florida."  Maywalt objected to the procedural and substantive reasonableness of the sentence, and specifically to the court's grouping ruling.

The district court entered a judgment that listed all the standard conditions of supervised release that applied to Maywalt, including Standard Condition 12, which provided:

> If the Probation Officer determines that you pose a risk to another person (including an organization), the Probation Officer may require you to notify the person about the risk and Defendant shall comply with that instruction.  The Probation Officer may contact the person and confirm that you have notified that person about the risk.

Maywalt did not object to Standard Condition 12 before the district court.

### STANDARD OF REVIEW

"We review *de novo* the interpretation and application of the Sentencing Guidelines."  *United States v. Cingari*, 952 F.3d 1301, 1305 (11th Cir. 2020).  "We review a criminal sentence for procedural and substantive reasonableness under an abuse of discretion

standard." *United States v. Livesay*, 587 F.3d 1274, 1278 (11th Cir. 2009) (citation omitted).

Generally, when a district court satisfies due process, and a defendant fails to raise constitutional objections or objections to the conditions of his supervised release at sentencing, we review for plain error. *See United States v. Moriarty*, 429 F.3d 1012, 1018 (11th Cir. 2005); *United States v. Rodriguez*, 75 F.4th 1231, 1246 n.5 (11th Cir. 2023). "A district court may easily satisfy [the due process] requirement by . . . . orally adopt[ing] the conditions of supervised release recommended in the defendant's [PSI] or in a standing administrative order." *Rodriguez*, 75 F.4th at 1246. Plain error requires: (1) an error; (2) that was plain; (3) that affects a defendant's substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Nash*, 438 F.3d 1302, 1304 (11th Cir. 2006). An error is not plain if, under current law, there is a lack of controlling authority or there is room for doubt about the outcome of an issue. *United States v. Humphrey*, 164 F.3d 585, 588 (11th Cir. 1999).

## DISCUSSION

Maywalt advances two arguments on appeal. First, he contends that the district court erred by refusing to group his fraud and tax offenses together when calculating his offense level. Second, Maywalt asserts—for the first time on appeal—that Standard Condition 12 of his supervised release should be vacated because it is

an unconstitutional delegation of judicial authority.  We take these arguments in turn.

*Grouping under section 3D1.2(d)*

Section 3D1.2, titled "Groups of Closely Related Counts," provides:

> All counts involving substantially the same harm shall be grouped together into a single Group.  Counts involve substantially the same harm within the meaning of this rule: . . . .
>
> (d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.
>
> Offenses covered by the following guidelines are to be grouped under this subsection:
>
> §2A3.5;
> §§2B1.1, 2B1.4, 2B1.5, 2B4.1, 2B5.1, 2B5.3, 2B6.1;
> §§2C1.1, 2C1.2, 2C1.8;
> §§2D1.1, 2D1.2, 2D1.5, 2D1.11, 2D1.13;
> §§2E4.1, 2E5.1;
> §§2G2.2, 2G3.1;
> §2K2.1;
> §§2L1.1, 2L2.1;
> §2N3.1;
> §2Q2.1;

> §2R1.1;
> §§2S1.1, 2S1.3;
> §§2T1.1, 2T1.4, 2T1.6, 2T1.7, 2T1.9, 2T2.1, 2T3.1.

U.S.S.G. § 3D1.2.

Maywalt contends that section 3D1.2(d) unambiguously requires all offenses within the table to be grouped together. He argues that the offense levels for his fraud and tax offenses were "determined largely on the basis of the total amount of harm or loss," and the guidelines instruct that those offenses "are to be grouped." He argues that "[t]he phrase 'are to be' plainly creates a mandatory requirement." Because sections 2B1.1 (which applies to Maywalt's fraud offenses) and 2T1.1 (which applies to his tax offenses) are both listed in the table, Maywalt maintains that the district court was required to group them.

But "the plain language of the 'to be grouped' provision in [section] 3D1.2(d) is ambiguous," *United States v. Lenoci*, 377 F.3d 246, 254 (2d Cir. 2004); *cf. United States v. Doxie*, 813 F.3d 1340, 1347 (11th Cir. 2016) (looking to the commentary to resolve "any ambiguity as to whether to group Doxie's fraud and tax counts together under § 3D1.2(c) or (d)"), because it could reasonably be read three ways. "(1) Group all counts that fall under guidelines which appear anywhere in the 'to be grouped' list; (2) group all counts that fall under guidelines that appear on the same line of the list; or (3) group all counts that fall under a particular guideline in the list (e.g., all counts under § 2C1.1 are to be grouped together)." *Lenoci*, 377 F.3d at 252.

Because the "to be grouped" provision in section 3D1.2(d) is ambiguous, we may look to the guidelines commentary to resolve the ambiguity. *Cf. United States v. Dupree*, 57 F.4th 1269, 1275 (11th Cir. 2023). That's what we did in *Doxie*. The commentary to section 3D1.2 explains that the group rules are not rigid; we must, instead, "look to the underlying policy of [Part D] as stated in the Introductory Commentary" when interpreting Part D and resolving ambiguities. U.S.S.G. § 3D1.2 cmt. background.

According to the introductory commentary, the underlying policy of the grouping rules is "to provide incremental punishment for significant additional criminal conduct," "to limit the significance of the formal charging decision[,] and to prevent multiple punishment for substantially identical offense conduct." U.S.S.G. ch. 3, pt. D, introductory cmt. "[T]he automatic grouping of offenses"—including offenses falling under sections 2B1.1 and 2T1.1—"can detract from the purpose of section 3D1.2—'to combine offenses involving *closely related* counts.'" *Doxie*, 813 F.3d at 1345 (quotations and citation omitted); *see also* U.S.S.G. § 3D1.2 cmt. background.

The commentary expounds upon the guidelines' instruction that counts should be grouped when they involve "substantially the same harm," including when "the offense level is determined largely on the basis of the total amount of harm or loss . . . or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior." U.S.S.G. § 3D1.2(d). The commentary

explains that grouping is appropriate for "crimes where the guidelines are based primarily on quantity or contemplate continuing behavior," like property crimes, drug offenses, and firearms offenses. *Id.* § 3D1.2 cmt. n.6.

The commentary also says that, where "the counts involve 'offenses to which different offense guidelines apply,' the counts 'are grouped . . . if the offenses are of the same general type and otherwise meet'" subsection (d)'s criteria for grouping. *Doxie*, 813 F.3d at 1345 (quoting U.S.S.G. § 3D1.2 cmt. n.6). "[T]he offenses [must] not only be similar in a general sense but also 'closely related' on the facts of the particular case." *Id.* (citation omitted). "A primary consideration in [section 3D1.2] is whether the offenses involve different victims," and "[c]ounts involving different victims (or societal harms in the case of 'victimless' crimes) are grouped together only as provided in subsection (c) or (d)." U.S.S.G. § 3D1.2 cmt. background.

We applied the commentary in *Doxie* and held that the district court did not err in refusing to group a defendant's fraud and tax counts together, despite both offenses being listed in the table in section 3D1.2(d). *Doxie*, 813 F.3d at 1345. We explained that fraud and tax offenses were not "of the same general type" because the loss for each offense was calculated differently, the fraud losses were not aggregated with the tax losses in the tax offense level, the crimes involved different victims (the defendant's employer was the victim of his fraud counts and the IRS was the victim of his tax counts), and the offenses involved distinctively independent

offense behavior—in other words, the fraud and tax offenses were not "closely related" on the facts of the case. *Id.* at 1346–47.

"The circumstances of [the defendant's] . . . fraud—submitting false invoices and making fraudulent credit card charges at his work—[we]re different in kind from his failure to report all of his income on his federal tax returns." *Id.* at 1347. Those crimes, we said, "were not interrelated in a way that made them 'integral cogs in continuing a scheme.'" *Id.* (alteration adopted). Because "the only connection between [the defendant's] unreported income and his fraud was that the money represented the proceeds of the fraud," this connection was "by itself [] insufficient for grouping under [section] 3D1.2." *Id.* (quotation marks omitted).

Maywalt's fraud and tax offenses do not fit the bill for grouping either. Much like in *Doxie*, his fraud and tax offenses are not "of the same general type" because the loss for each offense was calculated differently (under sections 2B1.1 and 2T1.1, respectively). His fraud losses would not be aggregated with the tax losses in the tax offense level because section 2T1.1 only accounts for a two-level increase for fraud losses. *See* U.S.S.G. § 2T1.1(b)(1) (adding for a two-level increase "[i]f the defendant failed to report or correctly identify the source of income exceeding $10,000 in any year from criminal activity"). The victims of his fraud offenses (Medicaid) and tax offenses (the IRS) were different. And his fraud and tax offenses were not closely related because they involved distinctively independent offense behavior, the only connection being that Maywalt's underreported or unreported income was the

proceeds of his fraud.  As the district court recognized, Maywalt's tax and fraud offenses were factually distinct because he was not trying to further his healthcare fraud by committing tax fraud.  Finally, imposing a two-level increase to the fraud offense level for the tax counts furthers section 3D1.2's stated goal of providing incremental punishment for significant additional criminal conduct, while preventing multiple punishments for substantially the same offense conduct.

As in *Doxie*, the district court did not err in declining to group Maywalt's tax and fraud counts.

*Standard Condition 12*

Maywalt also argues for the first time on appeal that Standard Condition 12 of his supervised release should be vacated because it is an unconstitutional delegation of judicial authority.  He contends that Article III of the Constitution prohibits delegations of judicial power to probation officers and that Standard Condition 12 permits a probation officer to make the impermissible decision of *whether* a defendant must notify third parties of any risk he may pose (instead of simply letting the probation officer determine when, where, and to whom the defendant must provide such notice).

Because the district court satisfied due process by informing Maywalt that he would have to "comply with the mandatory and standard conditions adopted by the Middle District of Florida," and because Maywalt failed to object to the conditions of his supervised release at sentencing, we review for plain error.  *See Rodriguez*, 75

F.4th at 1246 n.5. Maywalt has not shown plain error because there is a lack of controlling authority in his favor, and room for doubt about the outcome. *See Humphrey*, 164 F.3d at 588.

We have "drawn a distinction between . . . delegation[s] to a probation officer of 'a ministerial act or support service' and 'the ultimate responsibility' of imposing a sentence." *United States v. Nash*, 438 F.3d 1304–05 (11th Cir. 2006). We found the former to be a proper delegation, but the latter to be an unconstitutional delegation of judicial authority. *Id.* at 1305. "Where the court makes the determination of *whether* a defendant must abide by a condition, it is permissible to delegate to the probation officer the details of where and when the condition will be satisfied." *Id.* (alterations adopted) (quotation marks and citation omitted).

For example, we said in *Nash* that a condition requiring a defendant to participate in mental health counseling "as deemed necessary by the Probation Officer" was unconstitutional because this conditional phrase delegated to the probation officer the ultimate responsibility of determining whether the defendant must submit to the counseling. *Id.* at 1306. But a condition requiring the defendant to "notify third parties of risks that may be occasioned by [the defendant]'s criminal record or personal history or characteristics[,] *as directed* by the probation officer" properly directed the probation officer to oversee enforcement without "relegat[ing] the ultimate responsibility of determining" the sentence "to the unfettered discretion of the probation officer." *Id.* (quotation marks omitted).

As it appears in Maywalt's supervised release, Standard Condition 12 says the probation officer "may" require the defendant to notify third parties "if" the probation officer determines he poses a risk. It doesn't leave to the probation officer's discretion whether Maywalt must comply with the condition; his supervised release instructs that he "shall" comply with the conditions and with the probation officer's instructions. Standard Condition 12 only allows the probation officer to determine if Maywalt poses a risk to others and to whom notice of that risk must be given. It does not allow the probation officer to "unilaterally decide whether" Maywalt shall be subject to the condition at all. *Id.* Standard Condition 12's language is similar to the "[a]s directed by the probation officer" language we upheld in *Nash*. *Id.* at 1304. And it does not contain the language that was prohibited in *Nash*; namely, "as deemed necessary by the Probation Officer." *Id.* at 1306.

More importantly, neither we nor the Supreme Court have published any precedent instructing that Standard Condition 12 unconstitutionally delegates judicial authority. If anything, there is room for doubt as to the outcome of the issue. It was not plain error to impose Standard Condition 12.

**AFFIRMED.**