[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 19-11044

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GEO GEOVANNI,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:18-cr-00155-RBD-LRH-1

_____

Before ROSENBAUM, LUCK, and JULIE CARNES, Circuit Judges.

LUCK, Circuit Judge:

Geo Geovanni appeals his convictions and sentence for conspiracy to commit bank fraud and bank fraud. He challenges the sufficiency of the evidence supporting his convictions, the district court's loss amount finding at sentencing, and the district court's imposition and calculation of restitution. We affirm Geovanni's convictions but conclude that the district court clearly erred in determining the loss amount attributable to Geovanni. We therefore vacate his sentence and remand for resentencing.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In June 2018, the grand jury indicted Geovanni and his girlfriend, Elizabeth Longerbone, for conspiring to commit bank fraud with two unindicted coconspirators, in violation of 18 U.S.C. section 1349, and for three counts of bank fraud, in violation of 18 U.S.C. section 1344. The indictment alleged that Geovanni, Longerbone, and their two coconspirators schemed to obtain financing for buyers of condo units by providing "incentives," including down payment assistance, to the buyers, while concealing those incentives through fraudulent loan documents and sales contracts from the financial institutions that funded the mortgage loans. Longerbone pleaded guilty. Geovanni pleaded not guilty and went to trial.

The government presented four witnesses at trial. Two of these witnesses were the unindicted coconspirators—Christina Carracedo and Jennifer Del-Giudice.[1] The other two witnesses were underwriters from each defrauded financial institution—Jose Cadena of J.P. Morgan Chase and Timothy Lockwood of Wells Fargo Bank.

Carracedo had been a licensed mortgage broker since 2005 and worked for a mortgage company called Platinum One Financial. Before Platinum One, Carracedo owned a mortgage company called Silver Tree Lending with her business partner, Del-Giudice. Del-Giudice introduced Carracedo to Geovanni and Longerbone in 2007 or 2008. When Carracedo met Geovanni, he worked in real estate as a licensed real estate broker and lived with Longerbone, who worked as a hairdresser.

Geovanni owned two companies, Real Estate Park, Inc. and Windermere Financial Group, LLC, and he and Longerbone "worked hand in hand" and "as a team." Geovanni and Longerbone sold units at The Landings, a condominium development in Altamonte Springs, Florida. When Geovanni and Longerbone had a potential buyer for one of the units at The Landings, they would send the potential buyer's credit information to Carracedo for prequalification. Carracedo would then send Geovanni and Longerbone "a loan checklist of documents that [she]

---

[1] Del-Giudice is also referred to as Jennifer Profenno throughout the record, because that was her married name back in 2008.

would need to finalize the processing of the loan file."  Carracedo had "an arrangement" with Longerbone to split the profits Carracedo earned from the loan processing if Longerbone "would bring [her] the documents that [she] needed for the loan."

It was Carracedo's job to communicate with the banks and fill out the loan applications.  She verified each buyer's employment, income, and finances.  Carracedo sent the HUD-1 statements[2] to Geovanni but did not send him the loan applications.  Although Carracedo mostly spoke with Longerbone, not Geovanni, he emailed her about the incentives he was offering for multiple properties.

Carracedo was "aware" that Geovanni and Longerbone would offer their buyers incentives to purchase units at The Landings and that "the down payment was one of the incentives," also known as a "cash to close" incentive.  Carracedo acknowledged that incentives should be disclosed to lenders, but they weren't disclosed in her transactions on the condos.  Neither the HUD-1 statements nor the sales contracts disclosed that there were incentives offered to the buyers.  Carracedo would "alter" bank statements

---

[2] A HUD-1 statement is also known as a settlement statement.  As one of the underwriters explained at trial, it is "a record of . . . an accounting of where all the money is going . . . in association with the transaction."  *See also Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1319 n.2 (11th Cir. 2008) ("The Housing and Urban Development–1 ('HUD–1') statement is a settlement form used in closing a property sale; it details the costs and fees associated with a mortgage loan.").

for Geovanni and Longerbone's buyers, increasing their balances "to show that the buyers had the assets for closing."

For example, one buyer, Christopher Bradford, purchased four units at The Landings. Longerbone emailed copies of the sales contracts to Carracedo to prepare the loan applications. Bradford's sales contracts and HUD-1 statements didn't disclose any of the incentives. Carracedo prepared Bradford's loan application, which falsely said that his down payment would come from his bank account. Carracedo also falsely inflated in the loan application the amount of money in Bradford's bank account.

Bradford didn't pay his down payments with his own money; rather, the money came from "the selling side"—i.e., Geovanni's company, Windermere. Before one of Bradford's closings, Carracedo sent an email to Geovanni and Longerbone asking them to "[p]lease make sure [to] wire the money out of your account as soon as you receive it. [Bradford] has another closing on Tuesday and we have to have the money turned back around." Geovanni responded and wrote, "No problem. Just let me know when they close." Carracedo also sent Geovanni and Longerbone the HUD-1 forms related to Bradford's condo purchase, which didn't disclose that Bradford would pay the down payment with third-party funds. Carracedo sent that information to Geovanni and Longerbone to "let them know the amounts that were needed to close."

Another buyer, April Fontaine,[3] purchased multiple units at The Landings. Longerbone emailed Carracedo telling her that "[April] Fontaine is going ahead with all three. I will forward you the paystubs and bank statements as I receive them." Carracedo prepared April's loan application, which falsely represented that she had $76,000 in her bank account. Carracedo altered April's bank statements "to show that [she] had the funds" for closing. Carracedo altered the statements because "the bank would verify to make sure that [the buyers] had the money that they needed to close on the purchase" and because she knew the buyers were getting incentives to cover those costs; "[o]therwise, the loans would not close." April ended up closing on two units. Like the Bradford documents, April's sales contracts and HUD-1 statements didn't disclose that she was receiving incentives.

Longerbone then brought a couple to Carracedo, Anthony and Tricia Fontaine, who were related to April and also wanted to purchase a unit at The Landings. Like the other buyers, Anthony and Tricia's sales contract and HUD-1 statement didn't disclose that they were receiving incentives. The HUD-1 said that Anthony and Tricia would pay $34,219.40 at closing, but this wasn't true; Geovanni's company, Windermere, had wired $35,000 to Tricia to

---

[3] Because there were other buyers involved in this case with the last name of Fontaine, to avoid confusion, we refer to April and the other Fontaines by their first names.

cover those costs. Anthony and Tricia's loan application said that they had $31,500 in savings, which was also false.

Carracedo admitted that, "[i]n working with" Geovanni and Longerbone, she was "willing to be a participant in a situation where banks were being provided false information about the source of the borrower's down payment." In June 2008, when the market was declining and banks were tightening their guidelines, Geovanni emailed her suggesting that she work with other lenders to get some loans closed. In response, Carracedo said she would "try to squeeze out another approval out of Chase since they [were] the only ones not giving [them] any hassle on The Landings' appraisals right now." Geovanni later emailed Carracedo with the name of another mortgage consultant who, he said, had been closing loans in less than three weeks.

Del-Giudice's testimony provided further details about Geovanni's role in the conspiracy. She met Longerbone when Longerbone was her hairdresser, and she met Geovanni through Longerbone. Del-Giudice was very close with Carracedo and previously had altered bank statements when they worked together in 1999 and 2000. She learned that Geovanni worked as a real estate broker and owned two companies, Real Estate Park and Windermere. Del-Giudice's understanding was that Geovanni was partnered with the developer of The Landings and that he was their real estate broker. Geovanni and Longerbone were "working together" and recruited her to find buyers and would pay her a finder's fee. Geovanni and Longerbone told Del-Giudice about the

incentives for buyers and she helped distribute the money. She testified that Windermere, Geovanni's company, would assist "in the down payment of funding units for The Landings." She received the sales contracts for her buyers from Geovanni and Longerbone, and would email both of them if she had questions. Those contracts didn't disclose any incentives.

Del-Giudice testified that Windermere, one of Geovanni's companies, would wire the incentive money to her ex-husband's tax attorney, where it would stay until the loan was ready to close. The attorney's office would wire the money to her, and then she would wire the money to the buyer before closing. This was how Bradford received his incentive money for his closings. Windermere wrote the loan payoff letter for one of Bradford's units, Del-Giudice said, and Geovanni signed the payoff letter. Del-Giudice explained that Windermere wired her the incentive money, but her communications about the wire were with Longerbone. At one point, Del-Giudice had about $160,000 in her account from Windermere waiting to fund down payments.

The jury also heard from two mortgage underwriters, each of whom explained why the concealment of the down payment incentives mattered to the banks. Cadena, a mortgage underwriter for J.P. Morgan Chase, testified that sales contracts tell lenders "what's going on within the transaction." In his experience, incentives or contributions given to the buyer are "usually [in] an addendum within the contract" and disclosed in the HUD-1 statements. Cadena testified that the HUD-1 statement lists "cash from the

borrower," which is the amount that a borrower pays at closing. The money must be the buyer's own money because lenders require a borrower "to put up a certain risk," or "the way banks usually call it, [to have] skin in the game." Cadena reviewed a payoff letter from Windermere, signed by Geovanni, for one of the condo sales. Cadena explained that the payoff letter showed Windermere held a lien on the property that was paid off in the sale, and this meant Windermere was "a party to the transaction."

Cadena explained that down payment incentives were common in 2008 but needed to be approved by the bank and were illegal if they weren't disclosed. Cadena said that the uniform loan application form would have the most information about where a borrower's down payment money was coming from, while the HUD-1 wouldn't specify where a borrower was getting the funds for the down payment.

Lockwood, a financial crimes manager for Wells Fargo who worked as a mortgage underwriter for twenty years, testified that lenders review sales contracts to know "exactly what the terms" are for the transaction. He explained that "if there are any incentives," "concessions," or "contributions to the closing, they should be listed in the contract." Lockwood also explained the significance of the HUD-1 statement, which provides the amount of money a borrower must bring to closing. This "cash from borrower" is important to lenders because it is the "borrower's investment into the property." Lenders require borrowers to pay the down payment with their own funds because if they get the money from a third

party, "the borrower would not have any vested interest in the property."

The government rested its case and Geovanni moved for a judgment of acquittal. He argued that the government had failed to prove that he "willfully and knowingly conspired" because he "didn't submit anything to the banks," "didn't submit any loan applications," "didn't provide any . . . false documents," and "didn't alter . . . any documents." He also argued that the government had failed to prove that he knew or suspected Carracedo was committing bank fraud.

The government responded that the emails between the co-conspirators were enough to prove an agreement between them. The government pointed to Geovanni's receipt of the HUD-1 statements, which, it argued, showed that he knew, or should have known, that Carracedo wasn't disclosing the incentives to the lenders. The government also argued that because the purchase and sales contracts came from Geovanni's company, he knew the sales contracts didn't properly disclose the incentives. And the government argued the evidence showed that Geovanni agreed to send the buyers the money for their down payments and his company sent them the money. The district court reserved ruling on Geovanni's motion because, although it thought that the government's case was "very thin," it was "going to see" what the jury thought.

The jury found Geovanni guilty on all counts. The district court requested briefing on Geovanni's motion for judgment of acquittal. Geovanni filed a supplemental motion for judgment of

acquittal and for a new trial. He argued that the government relied on "inference upon inference" and the evidence was insufficient to prove the charges beyond a reasonable doubt.

The government responded that it proved the charged scheme and conspiracy and that the only issue for the jury was whether Geovanni knew about the unlawful purpose of the plan and willfully joined in it. The government argued that the evidence was sufficient for a reasonable jury to conclude that Geovanni knowingly and willfully participated in the conspiracy, and that he aided and abetted the bank fraud.

The district court denied Geovanni's motions for a judgment of acquittal and for a new trial. It concluded that the circumstantial evidence was enough for a jury to find that Geovanni had knowledge that false information was being provided to the lenders, and that either (1) he aided and abetted the offense, or (2) it was reasonably foreseeable that false information would be submitted to the banks by Carracedo. As to the substantive bank fraud counts, the district court concluded that "the circumstantial and direct evidence that the sales contracts were falsified and that they contained information that [Geovanni] knew to be false and that he either knew or could reasonably foresee would be submitted to the banks to induce them to issue loan proceeds [was] sufficient" for a reasonable jury to find him guilty.

The probation office prepared Geovanni's presentence investigation report, finding that he received $134,336.68 in fraudulently obtained proceeds and that the loss attributable to his

criminal conduct was $736,791.01. Because this loss amount was greater than $550,000 but less than $1,500,000, the probation office applied a fourteen-level enhancement under section 2B1.1(b)(1)(H) of the sentencing guidelines. The probation office also applied a two-level enhancement under section 3B1.3 because Geovanni used his special skill as a licensed real estate broker to commit the offense. With an offense level of 23, and a criminal history category of I, the probation office calculated his advisory guideline range as 46 to 57 months' imprisonment. The probation office also calculated that Geovanni owed $736,791.01 in restitution to J.P. Morgan Chase Bank, Fannie Mae, and Freddie Mac.

Geovanni objected to the loss amount. He moved to continue sentencing, arguing that the government's loss amount calculation differed from the numbers provided in discovery and he needed additional discovery "to verify the accuracy of the loss figures" and to "reconcile the discrepancy." The district court denied the motion.

In his sentencing memorandum, Geovanni argued that the government's loss amount calculation was inaccurate because it didn't account for any payments made by the buyers towards the loans and included condo units that were sold outside the statute of limitations. He also objected to any amount of restitution because the jury didn't make the factual findings necessary to support a restitution order.

At sentencing, Geovanni argued that the government didn't meet its burden of proving the loss amount. The government

presented a spreadsheet of the amount lost in each transaction and explained the formula it used. The district court overruled Geovanni's objections, finding the government met its burden of proving by a preponderance of the evidence that the loss amount was $736,791.01.

After finding that the two-level special skill enhancement didn't apply, the district court calculated a guideline range of 37 to 46 months' imprisonment. It sentenced Geovanni to 37 months' imprisonment, followed by three years of supervised release, and ordered him to pay $736,791.01 in restitution.

## II.    DISCUSSION

Geovanni appeals the district court's denial of his motions for a judgment of acquittal and a new trial. And he appeals the district court's loss amount finding at sentencing and the amount owed in restitution.

### Sufficiency of the Evidence

Geovanni argues that the district court erred by denying his motion for judgment of acquittal because the evidence was insufficient to convict him of conspiracy to commit bank fraud or the substantive counts of bank fraud. He concedes that the government proved the existence of a scheme that defrauded banks through false loan documents but maintains that he "did not participate in that scheme" and "had no knowledge of that scheme." As to the conspiracy count, Geovanni argues that the government failed to

prove that he agreed to participate in unlawful activity with another person and failed to prove that he knew of the unlawful activity and knowingly and willfully entered into it. As to the bank fraud counts, Geovanni argues that the government failed to prove that he knowingly provided false information to the banks. We disagree.

"We review de novo the denial of a motion for judgment of acquittal, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the jury's verdict." *United States v. Martin*, 803 F.3d 581, 587 (11th Cir. 2015). "[T]he issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt." *United States v. Thompson*, 473 F.3d 1137, 1142 (11th Cir. 2006). Where there is "any reasonable construction of the evidence [that] would have allowed the jury to find the defendant guilty beyond a reasonable doubt," we will not disturb the jury's verdict. *United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011) (quoting *United States v. Herrera*, 931 F.2d 761, 762 (11th Cir. 1991)).

"The test for sufficiency of evidence is identical regardless of whether the evidence is direct or circumstantial . . . ." *United States v. Mieres–Borges*, 919 F.2d 652, 656–57 (11th Cir. 1990). But where the government's case is circumstantial, "reasonable inferences, not mere speculation, must support the conviction." *United States v. Mendez*, 528 F.3d 811, 814 (11th Cir. 2008). "Because a jury is free to choose among the reasonable constructions of the evidence,

it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Godwin*, 765 F.3d 1306, 1320 (11th Cir. 2014) (quotation marks omitted).

### Conspiracy to Commit Bank Fraud

"To convict [Geovanni] of conspiracy to commit bank fraud . . . under 18 U.S.C. [section] 1349, the government had to prove beyond a reasonable doubt that (1) two or more persons agreed to a common and unlawful plan to commit bank . . . fraud . . . ; (2) [Geovanni] knew of the unlawful plan; and (3) []he knowingly and voluntarily joined the plan." *See Martin*, 803 F.3d at 588. "Because conspiracies are secretive by nature, the jury must often rely on inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *Id.* (quotation marks omitted).

Knowledge of the conspiracy may be established "through proof of surrounding circumstances such as acts committed by the defendant which furthered the purpose of the conspiracy." *United States v. Gonzalez*, 834 F.3d 1206, 1215 (11th Cir. 2016) (quoting *United States v. Moran*, 778 F.3d 942, 961 (11th Cir. 2015)). "The government need not prove that a defendant had knowledge of all details of the phases of the conspiracy. [It] need only demonstrate that the defendant knew the essential nature of the conspiracy." *United States v. Lluesma*, 45 F.3d 408, 410 (11th Cir. 1995). "Likewise, the government need not prove participation in a criminal conspiracy through direct evidence, but rather may suggest the

inference that a common purpose existed based upon circumstantial evidence." *Id.*

When viewed in the light most favorable to the government, the evidence was sufficient for a reasonable jury to find Geovanni guilty of conspiracy to commit bank fraud. The evidence showed that Geovanni, Longerbone, Carracedo, and Del-Giudice conspired together to obtain financing for buyers with insufficient assets by misrepresenting to the lenders the buyers' ability to fund down payments.

Carracedo testified that Geovanni and Longerbone worked "as a team" and "hand in hand." She agreed to work with them to obtain lending for buyers by putting together the "loan files" for banks. She told Geovanni and Longerbone what documents she needed and sent them a "loan checklist." Longerbone then gathered bank statements and other documents from the buyers and sent them to Carracedo. These bank statements showed that the buyers couldn't fund the required down payments, which were as much as twenty percent of the purchase price in some cases. Carracedo altered the bank statements, increasing the balances "to show that the buyers had the assets for closing."

The evidence showed that Geovanni, through his company, Windermere, filled the gap between what the loan applications said the buyers had in their accounts and what they actually had in their accounts by wiring money to the buyers to pay the required down payments. Carracedo testified that she would send the HUD-1 forms to Geovanni and Longerbone so that they would know

exactly how much money buyers needed for closing. Those HUD-1's—again, sent to Geovanni by the mortgage broker preparing the "loan files" to send to the banks—represented that the buyers were providing the money at closing that Geovanni knew he was in fact providing.

Del-Giudice testified that the money provided by Geovanni was "for the purposes of securing the loan." So, Del-Giudice testified, for her buyers, the money remained parked in her ex-husband's tax attorney's account, only to be sent to her and then to the buyer right before closing. If the financing fell through—if there was no closing requiring a down payment from a buyer—the money would go straight back to Geovanni. From this, the jury could reasonably infer that Geovanni agreed to participate in, and voluntarily joined, the conspiracy to conceal the source of the down payment funds. *See Gonzalez*, 834 F.3d at 1214–15 ("[T]he existence of an agreement [may] be proved by inferences from the conduct of the alleged participants" and "[t]he [g]overnment can establish that a defendant voluntarily joined the conspiracy through proof of surrounding circumstances such as acts committed by the defendant which furthered the purpose of the conspiracy." (quotation marks omitted)).

The jury also learned from two experienced underwriters that any buyer incentives should be disclosed in the sales contracts. The Wells Fargo underwriter testified that "if there are any incentives," "concessions," or "contributions to the closing, they should be listed in the contract." And the J.P. Morgan Chase underwriter

testified that "if there were contributions, it usually is an addendum within the contract." But none of the sales contracts in evidence disclosed the buyer incentives, let alone that Geovanni was funding the entire down payment. Rather, each contract said that it was the "entire agreement between the parties" and that the buyers weren't relying upon "any other monetary or financial advantage."

Both underwriters explained why these misrepresentations were material to the banks. The Wells Fargo underwriter testified that "[i]t's very important that we know exactly what the transaction entails . . . [b]ecause we're making a lending decision[,] [w]e're being asked to make a decision based on information that is provided in this contract . . . ." And the Chase underwriter told the jury that banks require a buyer's down payment on an investment property to be their own money because "the bank is putting up risk by lending up to a certain percentage of the value of the loan" and the buyer "is required to put up a certain risk along with that[,] . . . the way banks usually call it, you've got skin in the game."

There was also evidence that Geovanni wrote the fraudulent sales contracts. Carracedo and Del-Giudice testified that Geovanni and Longerbone sent them the sales contracts. Geovanni sent an email to Longerbone and Del-Giudice saying: "We are ONLY writing contracts on The Landing[s] propert[ies] . . . ." And, tellingly, Del-Giudice emailed Geovanni—not Longerbone—when she had a question about the contract terms and buyer incentives. From this, the jury could reasonably infer that Geovanni knew the

terms of the sales contracts, that he failed to disclose the buyer incentives he was providing, and that he had an intent to defraud. *See United States v. Grow*, 977 F.3d 1310, 1325 (11th Cir. 2020) (explaining that "an intent to defraud can be inferred from efforts to conceal the unlawful activity" (quotation marks omitted)).

And there was evidence that Geovanni sent the false sales contracts to Carracedo. In addition to Carracedo and Del-Giudice's testimony that both Geovanni and Longerbone sent them the sales contracts, the jury saw an email where Geovanni sent Carracedo a zip file named "Bradford" under the subject line "Bradford Contracts." Carracedo responded to that email saying Del-Giudice would have the buyer, Bradford, sign the documents. [*Id.*] When Longerbone sent the sales contracts to Carracedo, she did so from Geovanni's company, Real Estate Park. Again, Carracedo testified that she told Geovanni that she, as the mortgage broker, would use the documents Geovanni and Longerbone sent her to put together the "loan files" for the banks. From this, the jury could reasonably infer that Geovanni knew his false statements in the sales contracts would make their way to the banks.

Of course, "[e]vidence that the defendant profited from a fraud may also provide circumstantial evidence of the intent to participate in that fraud." *United States v. Machado*, 886 F.3d 1070, 1083 (11th Cir. 2018). Here, the evidence showed that Geovanni profited handsomely from the fraud. He, through his company, Windermere, held a lien on the properties worth tens of thousands of dollars that was paid off when the sales closed. Geovanni signed

"payoff letters" directing the settlement agent to wire a portion of the money from the banks to him.

With his money on the line, the evidence showed that Geovanni kept tabs on the fraud. Geovanni monitored the progress of the lending process, asking Carracedo in one email about the status of Anthony and April Fontaine's loans. In other emails, Geovanni suggested that Carracedo use different lenders to speed up the closing process and even pointed out that some of the lenders required less of a down payment from the buyers. Shortly after, and admittedly "frustrated," Carracedo sent an email to Geovanni saying that he, Longerbone, and Carracedo were "all in this together" and explaining that one of the reasons loans were taking longer to close was that these weren't "clean loans for clients with sufficient assets" and had to be "resubmit[ted] and restructure[d]" repeatedly. In other words, Geovanni knew that his buyers had insufficient assets for the down payments—which he papered over by providing them with the money for the hefty down payments—and knew that their lack of assets was delaying the loan application process.

Viewing the evidence as a whole and making all reasonable inferences in favor of the government, the evidence was sufficient for a reasonable jury to find Geovanni guilty of conspiring to commit bank fraud. *See Martin*, 803 F.3d at 588–89 (affirming conviction for conspiracy to commit bank fraud where the defendant sold her house to her father, but concealed the familial relationship from the lenders, when such a disclosure was "typically required in the sales contract," and the defendant "gave her father the money

he used for his $1,500 deposit," when an underwriter testified that the "deposit money was required to have come from" the defendant's father (quotation marks omitted)). And because there was sufficient evidence for a reasonable jury to find Geovanni guilty of the conspiracy, the district court did not err in denying his motion for judgment of acquittal.

### Bank Fraud

Geovanni argues there was insufficient evidence to convict him of the substantive offense of bank fraud because he had no knowledge of the scheme to defraud the banks, did not participate in the scheme, and did not knowingly provide false information to the banks. This argument also fails.

To convict Geovanni of bank fraud in violation of 18 U.S.C. section 1344, the government had to prove beyond a reasonable doubt that: (1) a scheme existed to obtain money or property in the custody of a federally insured financial institution[4] by fraud; (2) he participated in the scheme by means of material false pretenses, representations, or promises; and (3) he acted knowingly. *United States v. McCarrick*, 294 F.3d 1286, 1290 (11th Cir. 2002). "As with other fraud crimes, circumstantial evidence may prove a defendant's knowledge." *Martin*, 803 F.3d at 588 (quotation omitted; alteration adopted).

---

[4] The parties stipulated at trial that both banks involved, Wells Fargo and J.P. Morgan Chase, "were insured by the Federal Deposit Insurance Corporation."

There are two ways that a defendant can be held substantively liable for the actions of others.  First, under an aiding and abetting theory, a defendant is liable if he:  (1) associated himself with a criminal venture; (2) participated in it as something he wished to bring about; and (3) sought by his actions to make it succeed.  *Rosemond v. United States*, 572 U.S. 65, 76 (2014); *United States v. Joseph*, 709 F.3d 1083, 1102 (11th Cir. 2013).  The evidence must show that the defendant acted with the intent to defraud, and the government can make this showing by "demonstrat[ing] that the [d]efendant had the same willfulness and unlawful intent as the actual perpetrators of the fraud."  *United States v. Williams*, 390 F.3d 1319, 1324 (11th Cir. 2004).

Second, under a *Pinkerton*[5] theory of liability, "[e]ach party to a continuing conspiracy may be vicariously liable for substantive criminal offenses committed by a co[]conspirator during the course and in furtherance of the conspiracy, notwithstanding the party's non-participation in the offenses or lack of knowledge thereof." *United States v. Silvestri*, 409 F.3d 1311, 1335 (11th Cir. 2005) (quotation omitted; emphasis omitted).  The substantive offenses must be a "reasonably foreseeable consequence of the conspiracy." *Id.* at 1336.

Here, there was sufficient evidence for a reasonable jury to find Geovanni guilty of bank fraud under both theories.  As to an aiding and abetting theory of liability, Geovanni, Longerbone,

---

[5] *Pinkerton v. United States*, 328 U.S. 640 (1946).

Carracedo, and Del-Giudice engaged in a scheme to obtain financing for buyers with few assets by misrepresenting to the lenders the buyers' ability to fund down payments.  A reasonable jury could find beyond a reasonable doubt that Geovanni aided and abetted his coconspirators' submission of materially false loan applications because:  (1) Carracedo told Geovanni she would use the documents Geovanni and Longerbone gave her to put together the "loan files"; (2) Geovanni wrote and provided the sales contracts, which didn't disclose the incentives he was providing; (3) Carracedo sent the HUD-1 statements, which also did not disclose the incentives, to Geovanni to make sure he knew how much money he needed to wire to the buyers for closing; (4) Geovanni agreed to, and did, wire the money to the buyers; and (5) Geovanni profited from the scheme.

There was also sufficient evidence for a reasonable jury to find Geovanni guilty of bank fraud under a *Pinkerton* theory of liability.  As we explained above, there was sufficient evidence supporting Geovanni's conviction for conspiracy to commit bank fraud because:  (1) Geovanni's company, Windemere, wired the money to the buyers to cover the down payments they couldn't afford; (2) Carracedo sent Geovanni the HUD-1 forms so that Geovanni knew exactly how much money the buyers needed for closing; (3) Geovanni was aware that Carracedo was sending the misleading HUD-1 forms on to the banks as part of the loan application process; (4) there was evidence that Geovanni knew about and wrote the fraudulent sales contracts; and (5) Geovanni profited

from this scheme to defraud the banks through the liens his company, Windemere, held on the properties. It was therefore reasonably foreseeable to Geovanni, as a party to the conspiracy, that his coconspirators would submit fraudulent loan applications in furtherance of the conspiracy. Thus, there was sufficient evidence for a reasonable jury to find that Geovanni committed the substantive counts of bank fraud. *See Silvestri*, 409 F.3d at 1335–36.

## Motion for New Trial

Geovanni argues that the district court abused its discretion by denying his motion for a new trial because "the jury's verdict [was] contrary to the great weight of the evidence." Because the "decision to grant or deny a new trial motion based on the weight of the evidence is within the sound discretion of the trial court," an "appellate court may reverse only if it finds the decision to be a clear abuse of that discretion." *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985).

In *Martinez*, we explained that "[m]otions for new trials based on weight of the evidence are not favored" and "[c]ourts are to grant them sparingly and with caution, doing so only in those really 'exceptional cases.'" *Id.* at 1313. A district court "may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Id.* at 1312–1313. As such, "courts have granted new trial motions based on weight of the evidence only where the credibility of the government's witnesses had been impeached and the government's case had been marked by uncertainties and discrepancies." *Id.* at 1313.

Geovanni does not argue that he impeached the government's witnesses, or that the government's case was "marked by uncertainties and discrepancies." Instead, he repeats his argument that the evidence was insufficient for the jury to convict him. We rejected that argument as to Geovanni's sufficiency claim and we reject it here too.

We conclude that Geovanni's case isn't one of those "exceptional cases" described by *Martinez*. The district court didn't clearly abuse its discretion by denying Geovanni's motion for a new trial. *See id.* ("[W]e are convinced that the jury's verdict in this case was not contrary to the weight of the evidence, and thus that the district court should not, in any event, have granted a new trial on this ground.").

### Loss Amount Calculation

The district court calculated that Geovanni's guideline range was 37 to 46 months' imprisonment and sentenced him to the bottom of that range. This guideline calculation was based on a finding that the loss amount attributable to Geovanni's criminal conduct was $736,791.01. Geovanni argues that the district court erred by finding that the government had proven the loss amount by a preponderance of the evidence. This was error, Geovanni maintains, because the government presented no evidence as to the loss amount and the district court relied solely on a spreadsheet prepared by the government that wasn't in evidence and wasn't based on the evidence.

The government responds that we should review the loss amount issue for plain error because Geovanni "argues for the first time that the spreadsheet did not constitute evidence upon which the district court could rely in determining whether the United States had met its burden of proving the loss amount." But Geovanni's contention was and is that the government failed to meet its burden of proof as to loss amount, not that spreadsheets can never summarize evidence.

"To preserve an issue for appeal, a defendant must first present it to the district court, raising that point in such clear and simple language that the trial court may not misunderstand it." *United States v. Corbett*, 921 F.3d 1032, 1043 (11th Cir. 2019) (quotation marks omitted; alteration adopted). Geovanni preserved his challenge to the district court's loss amount calculation by: (1) objecting to the "factual accuracy" of "the loss amounts" in the presentence investigation report; (2) moving to continue sentencing so that he could "verify the loss numbers [were] correct" and "reconcile the discrepancies"; and (3) arguing at sentencing that the government's loss amount was inaccurate. Geovanni's objection to the accuracy of the loss amount in the presentence investigation report by itself shifted the burden to the government to prove the loss amount at sentencing. *See United States v. Washington*, 714 F.3d 1358, 1361 (11th Cir. 2013) ("When the government seeks to apply an enhancement under the [s]entencing [g]uidelines over a defendant's factual objection, it has the burden of introducing 'sufficient and reliable' evidence to prove the necessary facts by a

preponderance of the evidence."). Because the issue is preserved, we review the district court's calculation of the loss amount attributable to Geovanni for clear error. *See United States v. Cavallo*, 790 F.3d 1202, 1232 (11th Cir. 2015).

"[A] district court may make factual findings regarding loss based on trial evidence, undisputed statements in the [p]resentence [i]nvestigation [r]eport . . . , or evidence presented at the sentencing hearing." *United States v. Baldwin*, 774 F.3d 711, 727 (11th Cir. 2014). "[A]bsent a stipulation or agreement between the parties, an attorney's factual assertions at a sentencing hearing do not constitute evidence that a district court can rely on." *Washington*, 714 F.3d at 1361.

Here, Geovanni disputed the loss amount in the presentence investigation report, and the government presented no witnesses or documents at sentencing. The district court relied only on the spreadsheet the government made summarizing other documents. But the government admits that only "some" of those other documents were introduced at trial—and therefore were evidence that could support the district court's loss amount finding. That leaves "some" documents that weren't introduced at trial and couldn't support the loss amount finding. Thus, the amounts in the government's spreadsheet—the only thing the district court relied on to calculate the loss amount attributable to Geovanni—couldn't support the district court's factual finding as to the entire $736,791.01 loss amount. *See Baldwin*, 774 F.3d at 727.

The government argues that the district court also had its explanation of how the government calculated the loss amounts in its spreadsheet. But the government's argument is not "evidence that a district court can rely on." See Washington, 714 F.3d at 1361. Absent a stipulation from the parties (and there was no stipulation here), those assertions were not evidence. See id.

And if the government's factual assertions at sentencing are not evidence, typing those same assertions into a spreadsheet does not transform them into evidence. Relying on section 6A1.3 of the sentencing guidelines and our decision in United States v. Bourne, 130 F.3d 1444, 1447 (11th Cir. 1997), the government contends that Geovanni must "show that the evidence"—its spreadsheet— "lack[ed] 'minimal indicia of reliability'" by "establish[ing] that the challenged evidence is materially false." But Bourne applies when the government offers evidence to support an enhancement under the sentencing guidelines and there is a dispute about the reliability of that evidence. See id. at 1447–48 (dispute over FBI agent's testimony as to loss amount in a robbery where the agent "based his testimony on his recollection of the bank auditor's report prepared on the day of the robbery"; while we concluded it was not "materially false or unreliable," we remanded and "suggest[ed] that the district court revisit the amount" because "[i]t should be a simple matter for the special agent to obtain the auditor's report or for the bank auditor to testify"). Here, the government offered only its spreadsheet to establish the loss amount—not witnesses,

documents, or anything else.  There is no dispute about the evidence where there is no evidence.

We therefore conclude that the district court clearly erred by relying on the government's spreadsheet without supporting evidence to calculate the loss amount and clearly erred by applying the resulting fourteen-level sentencing enhancement.  We vacate Geovanni's sentence and remand for a hearing, with evidence, as to the loss amount.  *See United States v. Martinez*, 606 F.3d 1303, 1304 (11th Cir. 2010) (explaining that "a reviewing panel may remand . . . to permit further evidence to be presented" by the government at a resentencing hearing "even when [the government] ha[d] been given an opportunity but fail[ed] to do so on the first round"); *see also United States v. Tampas*, 493 F.3d 1291, 1305 (11th Cir. 2007) (remanding for resentencing to allow government to offer evidence to prove restitution amount).

## Restitution

At sentencing, the district court ordered Geovanni to pay $736,791.01 in restitution to the defrauded financial institutions. Geovanni argues that the imposition of restitution violated his Sixth Amendment right to a jury trial because there was no jury finding on the facts needed to support the restitution order.  But, as Geovanni acknowledges, this argument is foreclosed by our decision in *Dohrmann v. United States*, 442 F.3d 1279, 1281 (11th Cir. 2006) ("We agree with the holdings of our sister circuits and adopt

their reasoning in holding that *Apprendi*[6] does not apply to a restitution order."). We are bound by *Dohrmann* under our prior panel precedent rule. *See United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) (explaining that "a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*"). Although Geovanni argues that *Dohrmann* was wrongly decided, we could not ignore *Dohrmann* even if we agreed. *See United States v. Steele*, 147 F.3d 1316, 1317–18 (11th Cir. 1998) (en banc) ("Under our prior precedent rule, a panel cannot overrule a prior one's holding even though convinced it is wrong.").

Geovanni also argues that the district court erred in calculating the amount of restitution because the government didn't offer evidence to support it. But Geovanni didn't object to the presentence investigation report's calculation of restitution, unlike the part of the report calculating the loss amount for the sentencing guidelines where he did object. "It is the law of this circuit that a failure to object to allegations of fact in a [presentence investigation report] admits those facts for sentencing purposes." *United States v. Wade*, 458 F.3d 1273, 1277 (11th Cir. 2006). Because Geovanni admitted to the restitution amount, there was evidence supporting the district court's calculation of the restitution amount (unlike the loss amount issue where Geovanni did object and there was no

---

[6] *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

19-11044                Opinion of the Court                31

evidence of loss amount).  Thus, the district court didn't err in relying on Geovanni's admission to calculate the amount he owed in restitution.

## III.    CONCLUSION

We **AFFIRM** Geovanni's convictions, **VACATE** his sentence, and **REMAND** for a new sentence hearing.